**WESLEYAN PENSION FUND, INC., Plaintiff,**

v.

**FIRST ALBANY CORPORATION et al., Defendants.**

**No. IP 96–0023–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 28, 1997.

Mark B. Barnes Leagre & Barnes, Indianapolis, Indiana, for Plaintiff.

Michael A. Brady, Buffalo, New York, Mark E. Maddox, Maddox, Koeller & Hargett, Indianapolis, Indiana, Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Philadelphia, Pennsylvania, Lynn C. Tyler, Barnes & Thornburg, Indianapolis, Indiana, for Defendant.

### ENTRY DISCUSSING DENIAL OF MOTION TO DISMISS

BARKER, Chief Judge.

Plaintiff Wesleyan Pension Fund has brought its Third Amended Complaint ("Complaint") for injuries it believes it sustained as a result of its investment in certain real estate limited partnerships. Wesleyan's

claims arise under Indiana statutory and common law and specifically allege (1) violations of Indiana securities law, Ind.Code § 23–2–1–1 *et seq.*, including the offer and sale of unregistered securities, the issuance, offer, and sale of securities by unregistered broker-dealers and agents, and the use of untrue or misleading statements in connection with the sale of those securities; (2) violations of the Indiana Racketeer Influenced and Corrupt Organization Act, Ind. Code § 35–45–6–1 to 6–2; and (3) constructive fraud. Defendants in this action are seventeen separate business entities, eleven named individuals, and an unknown number of unnamed individual defendants. This Court has diversity jurisdiction over this suit pursuant to 28 U.S.C. § 1332.

On June 20, 1996 the following defendants jointly moved to dismiss this cause of action for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2): Steven Zalkind ("Zalkind"), Donald Love ("Love"), Robert Hogan ("Hogan"), Clover Financial Corporation, Resource Investment Corporation, Aurora Management Corporation, Gladstone Management Corporation, Fleetwood Management Corporation, Somerset Management Corporation, Dome Management Corporation, Greystone Management Corporation, Action Management Corporation, Marina Park L.P., Indian Hills Apartment L.P., GP Apartments L.P., Hunting Ridge Apartment L.P., Hampton Forest L.P., and Savannah Royale L.P. (collectively "the Clover Defendants").

For the reasons set forth below, the Court **DENIES** in their entirety the Clover Defendants' Rule 12(b)(6) motion to dismiss for failure to state claim and Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. The Court **DENIES AS MOOT** Wesleyan's motion to bar materials outside the pleadings and motion to strike false affidavit, the Clover Defendants' motion to stay the proceedings, and the parties' respective motions to certify questions of Indiana law to the Supreme Court of Indiana.

## I. Statement of facts

Plaintiff Wesleyan Pension Fund, Inc. ("Wesleyan") is an Indiana corporation with its principal business location in Indianapolis. Wesleyan is managed and governed by a Board of Directors, which, through its Investment Committee, directs its investments.

For purposes of this Entry the defendants the Court designates as the Clover Defendants consist of three individuals, nine closely held corporations, and six limited partnerships. When examined closely we find that the three individual defendants, Zalkind, Love, and Hogan, appear completely to control all of the closely held corporations and limited partnerships that we count among the Clover Defendants. For example, Zalkind, Love, and Hogan, are allegedly the principal shareholders of each of the nine corporate defendants. Zalkind, Love, and Hogan allegedly own and control Clover Financial Corporation (*Id.*, ¶¶ 28, 30, 32), which in turn allegedly wholly owns the other eight corporations as subsidiaries. In regard to the limited partnerships, Wesleyan alleges that Marina Park L.P. has Aurora Management Corporation as its general partner (Complaint, ¶ 14) and contends that Zalkind, Love, and Hogan are its limited partners (Pl.'s Resp. Br., Ex. A., p. 2). Wesleyan alleges that Indian Hills Apartment L.P. has Gladstone Management Corporation as its general partner (Complaint, ¶ 16) and contends that Zalkind, Love, and Hogan are its limited partners (Pl.'s Resp. Br., Ex. A., p. 3) Wesleyan alleges that GP Apartments L.P. has Fleetwood Management Corporation as its general partner (Complaint, ¶ 18) but does not identify the limited partners. Hunting Ridge Apartment L.P. has as its general partner Dome Management Corporation (Complaint, ¶ 21) and contends that Zalkind, Love, and Hogan are its limited partners along with three other individuals not named as defendants and Plaintiff (Pl.'s Resp. Br., Ex. A., p. 8). Wesleyan alleges that Hampton Forest L.P. has as its general partner Greystone Management Corporation (Complaint, ¶ 23) and contends that Zalkind, Love, and Hogan are its limited partners (Pl.'s Resp. Br., Ex. A., p. 9). Lastly, Wesleyan alleges that Savannah Royale L.P. has Action

Management Corporation as its general partner (Complaint, ¶ 26) and contends that the limited partners are itself, Zalkind, Love, and Hogan (Pl.'s Resp. Br., Ex. A. p. 10).

In short, each of the six limited partnership (except possibly GP Apartments L.P.) has Zalkind, Love, and Hogan as limited partners and a corporation controlled by Zalkind, Love, and Hogan as its general partner. These latter six corporations and the other three corporate defendants are all allegedly controlled by Zalkind, Love, and Hogan, because the individual defendants are the alleged sole shareholders and controlling principals of one of the corporations, Clover Financial Corporation, which in turn wholly owns the other eight corporations.

In its Complaint, Wesleyan alleges that the Clover Defendants promoted, offered, and sold to Wesleyan by the end of 1989 over § 14.2 million of real estate securities ("the Clover Securities") that were illiquid, overvalued, difficult to value, speculative, and unsuitable for a tax-exempt organization such as Wesleyan. (Complaint, ¶ 95) These securities allegedly represented one third of its pension find's total assets. (Complaint, ¶ 96) Wesleyan acquired these securities between 1986 and 1989 through seven principal investment transactions, which we outline in the following paragraphs.

1. In January 1986 Wesleyan purchased half of the mortgage of Marina Park Apartments in North Miami, Florida, for $1.6 million from defendant Marina Park L.P. (Complaint, ¶ 36). In January 1990 Wesleyan agreed to extend the maturity date of the mortgage note until January 1996. (Id., ¶ 40) In February 1990 Wesleyan and Marina Park L.P. entered into an agreement to defer the payment of certain interest until the maturity date of the mortgage. (Id.) Marina Park L.P. eventually sold the mortgaged apartment complex in July 1994, transmitting to Wesleyan approximately $1.7 million of the proceeds. (Id., ¶ 42) Wesleyan alleges the defendant still owes it $494,225 in accrued deferred interest from the original financing and the 1991 refinancing of the mortgage. (Id.)

2. In January 1986 Wesleyan lent $1.6 million to defendant Indian Hills L.P. in exchange for a promissory note, secured by the limited partnership's ownership interest in Indian Hills Apartments in Aniston, Alabama, and by personal guaranties of Zalkind, Love, and Hogan. (Id., ¶¶ 44, 48). In 1992 and 1993 Wesleyan agreed to modify the note by deferring certain interest due under the note. (Id., ¶¶ 50, 51) Indian Hills L.P. eventually sold the apartment complex in July 1994, remitting to Wesleyan $1,050,000. (Id., ¶ 52)

3. In February 1988 Wesleyan formed Grove Park Joint Venture with defendant GP Apartments L.P. and contributed $2,550,000 at that time to the joint venture in exchange for an interest in any profit from the joint venture's ownership of Grove Park Apartments in Raleigh, North Carolina. (Id., ¶¶ 53, 58) The joint venture sold the apartment complex in July 1994, and Wesleyan received $1,560,000 from the sale. (Id., ¶ 60)

4. In June 1988 Wesleyan formed Summerville Joint Venture with defendant Somerset Management Corporation and contributed $5.4 million to the joint venture at that time in exchange for an interest in any profit from the joint venture's purchase of Somerset Apartments in Summerville, South Carolina. (Id., ¶¶ 61, 66) In September 1989 $3 million of Wesleyan's initial investment was returned to it. (Id., ¶ 66) The joint venture sold the apartment complex in July 1994, and Wesleyan received $735,000 in proceeds. (Id., ¶ 68)

5. In July 1988 Wesleyan invested $1,350,000 to obtain a 65 percent interest in defendant Hunting Ridge L.P. and an equal interest in any profit generated by the limited partnership's ownership of Hunting Ridge Apartments in Greenville, South Carolina. (Id., ¶¶ 69, 74) The limited partnership sold the apartment complex in November 1994, and Wesleyan received $250,000 of the proceeds. (Id., ¶ 76)

6. In July 1988 Wesleyan purchased a 55 percent interest in a $3 million promissory note from defendant Hampton Forest L.P., secured by a mortgage on Hampton Forest Apartments in Greenville, South Carolina. (Id., ¶¶ 77, 82) In December 1988 defendant Vest Associates, the other mortgagee, as-

signed 5 percent of the mortgage interest to Wesleyan (augmenting Wesleyan's interest to 60 percent) and the remaining 40 percent to a third party. (*Id.*, ¶ 83) The limited partnership sold the apartment complex in July 1994, and Wesleyan received § 1,823,000 in proceeds. (*Id.*, ¶ 86) Wesleyan alleges that the limited partnership owes it accrued deferred interest on the mortgage note in the amount of § 199,212. (*Id.*)

7. In September 1989 Wesleyan invested $4.1 million to obtain an 80 percent interest in Savannah Royale L.P. and an equal interest in any profit generated by the limited partnership's ownership of Royal Oaks Apartment in Savannah, Georgia. (*Id.*, ¶¶ 87, 92) In 1992 the limited partnership returned to Wesleyan $100,000 of its initial investment. (*Id.*, ¶ 92) The limited partnership sold the apartment complex in July 1994, and Wesleyan received $3,240,000 of the proceeds. (*Id.*, ¶ 94)

## II. Standard for Rule 12(b)(2) Motion

When personal jurisdiction is challenged, the plaintiff bears the burden of demonstrating a basis for its assertion. *McIlwee v. ADM Industries, Inc.*, 17 F.3d 222, 223 (7th Cir.1994); *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987). The Court may consider affidavits, depositions, and other documents outside the pleadings in reaching its decision, *Nelson by Carson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir.1983), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1277, 1278, 79 L.Ed.2d 682 (1984), but must construe all facts concerning jurisdiction in favor of the non-movant, including disputed or contested facts. *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1215 (7th Cir.1984). *See also RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir.1997); *Turnock*, 816 F.2d at 333.

A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant only if a court of the state in which the district court sits would have such jurisdiction. *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 580 (7th Cir.1994); *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1243 (7th Cir.1990), *cert. denied*, 499 U.S. 947, 111 S.Ct. 1415, 113 L.Ed.2d 468

(1991); Fed.R.Civ.P. 4(e). Indiana can exercise two kinds of personal jurisdiction over a nonresident defendant, general and specific. General jurisdiction exists where the cause of action does not arise out of or relate to a defendant's activities in the forum, but where the defendant nevertheless has "continuous and systematic general business contacts with the forum." *Id.* Specific jurisdiction, on the other hand, refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contact with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984).

While Wesleyan contends that "some basis for the assertion of general jurisdiction over the Clover Defendants exists in light of their systematic and continuous involvement with entities and individuals within the State of Indiana," (Pl.'s Resp. Br., p. 12 n. 11) Wesleyan limits its jurisdictional argument to the question of specific jurisdiction. In failing to argue general jurisdiction over the nonresident defendants, Wesleyan waives that ground for personal jurisdiction over those defendants. *See RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir.1997); *Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 663 (7th Cir.1986), *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987). Consequently, we focus exclusively on the question of specific jurisdiction.

In the case of a nonresident defendant that is not generally doing business in Indiana, an Indiana court may exercise personal jurisdiction over the defendant where both of the following obtain: (1) Indiana's long-arm statute authorizes the exercise of such jurisdiction; and (2) exercise of such jurisdiction complies with the due process clause of the Fourteenth Amendment to the United States Constitution. *NUCOR*, 28 F.3d at 580; *Wilson*, 916 F.2d at 1243. In the case of Indiana's long-arm statute, the twin inquiries collapse into a single due-process inquiry, because the scope of Indiana's long-arm statute, Trial Rule 4.4(A), has been deemed to extend the State's personal jurisdiction to the constitutional limit. *Wilson*, 916 F.2d at 1243; *Oddi v. Mariner–Denver, Inc.*, 461 F.Supp. 306, 308 (S.D.Ind.1978). *See also*

*Brokemond v. Marshall Field & Co.,* 612 N.E.2d 143, 145 (Ind.App.1993). Thus, we analyze whether personal jurisdiction over the defendants is permissible solely with regard to federal due process standards.

In order for Indiana constitutionally to exercise specific personal jurisdiction over the Clover Defendants in this case, the Clover Defendants must have "certain minimum contacts with [Indiana] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). This requirement protects a defendant from being subject to binding judgments of a forum with which the defendant has established no meaningful "contact, ties or relations." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528 (1985) (quoting *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 160). By requiring that defendants have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J. concurring in judgment), the due process clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). *See also King,* 471 U.S. at 471–72, 105 S.Ct. at 2181–82.

With regard to specific jurisdiction, the Supreme Court has held that a defendant establishes minimum contacts with a forum when it purposefully avails itself of the privilege of doing business in the forum. *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183. *See also Logan Prods., Inc. v. Optibase, Inc.,* 103 F.3d 49, 52 (7th Cir.1996) (using "purposeful availment" wording as standard test for specific jurisdiction); *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V,* 28 F.3d 572, 580 (7th Cir.1994) (same). In other words, a defendant may be subject to specific jurisdiction of a foreign court where the de-

fendant engages in some purposeful or deliberate activity effecting the forum and the litigation results from injuries that "arise out of or relate to" those activities. *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182. This requirement of some deliberate or purposeful conduct or availment on the defendant's part ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts. *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183 (quoting respectively *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958); *Keeton v. Hustler Magazine Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984); and *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 568, 62 L.Ed.2d 490 (1980)). Instead, due process allows specific jurisdiction only where, as a result of its contacts with the forum, the defendant "reasonably should have anticipated being haled into court in Indiana." *NUCOR,* 28 F.3d at 580 (quoting *Wilson,* 916 F.2d at 1244 (quoting *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567)).

### III. Discussion of Rule 12(b)(2) Motion

Wesleyan contends that this case is controlled by *Burger King.* Specifically, Wesleyan contends that its course of dealing with the various Clover Defendants over its seven real estate securities investments shows that the Clover Defendants established continuing obligations with a resident of Indiana extensive enough to satisfy the minimum contacts requirement of due process. In analyzing the contacts created by the contractual relationship arising from the real estate securities transactions in this case, we note that in *Burger King,* the Supreme Court rejected a rigid, mechanical test for determining personal jurisdiction in contract actions.

[A] contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors— prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully

established minimum contacts within the forum.

*Burger King,* 471 U.S. at 479, 105 S.Ct. at 2185 (internal quotations and citations omitted). Wesleyan argues that, following the Supreme Court's realistic approach, the various Clover Defendants clearly established minimum contacts with Indiana through their long-term business relationship with Wesleyan, because they entered into seven separate transactions between 1986 and 1989 with Wesleyan that allegedly involved the purchase of approximately § 14.2 million in real estate securities. *See* Complaint, ¶¶ 34–94.

Wesleyan's argument relies on a key assumption, which merits our attention at the outset of our discussion: namely, that for purposes of the jurisdictional inquiry, the Clover Defendants may be treated as a single entity, rather than as nine separate closely held corporations, six separate limited partnerships, and three separate individuals. The Clover Defendants describe this assumption as "sleight of hand" and contend that Wesleyan must demonstrate that each and every one of the constituent defendants established minimum contacts with the forum. (Defs' Reply Br., pp. 11–12) The facts of the case, however, suggest that, at least for the jurisdictional inquiry, Wesleyan's aggregation of the defendants into a single group is appropriate and permissible.

To begin, let us assume for argument's sake that, instead of nine corporate defendants, only one existed. In other words, let us imagine that, instead of Clover Financial Corporation ("Clover") and its eight alleged subsidiaries, there was only Clover. In such a case, Clover would have been the general partner of each of the six limited partnerships and also would have been the corporation that directly contracted with Wesleyan in the one real estate securities transaction not involving a limited partnership. There would be no reason in this scenario not to aggregate the contacts with the forum. Any contacts of the limited partnerships would be attributable to Clover as general partner. *See, e.g., Brown v.1995 Tenet ParaAmerica Bicycle Challenge,* 931 F.Supp. 592, 594 (N.D.Ill.1996) (personal jurisdiction over a partnership is sufficient to establish personal jurisdiction over the general partners by virtue of the general partners' role as agents and principals of the partnership); *Banta Corp. v. Hunter Pub. Ltd. Partnership,* 915 F.Supp. 80, 84 (E.D.Wis.1995) (same); *Wolfson v. S & S Securities,* 756 F.Supp. 374, 377 (N.D.Ill.1991) (same); *Felicia, Ltd. v. Gulf American Barge, Ltd.,* 555 F.Supp. 801, 806 (N.D.Ill.1983) (same). Any other relevant contact established in the course of the transactions at issue in this case would necessarily have been made by Clover or by that corporation's alleged principals and sole shareholders, Zalkind, Love, and Hogan. The question, then, is whether the existence of Clover's eight subsidiaries is a sufficient reason to apportion the contacts among the several separate entities and thereby frustrate, or at least greatly complicate, the due process contact analysis. Traditionally, courts presume that a parent and a subsidiary are institutionally independent when determining whether a subsidiary's contacts with the forum may justify assertion of personal jurisdiction over the parent. *See, e.g., Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 336, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925). However, this institutional independence is only a presumption and may be overcome by clear evidence. *Donatelli v. National Hockey League,* 893 F.2d 459, 465 (1st Cir.1990). Where a parent utilizes its subsidiary in such a way that an agency relationship can be perceived, a court may assert personal jurisdiction over the parent. *Donatelli,* 893 F.2d at 465–66; *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 420 (9th Cir.1977); *Milligan v. Anderson,* 522 F.2d 1202, 1205–07 (10th Cir. 1975); *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 492 (5th Cir.1974), *overruled on other grounds, Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702–03, 102 S.Ct. 2099, 2104–05, 72 L.Ed.2d 492 (1982); *Marsh v. Kitchen,* 480 F.2d 1270, 1272–73 (2nd Cir. 1973); *see also* 4 Charles Wright & Arthur Miller, Federal Practice and Procedure: Civil 2d § 1069, at 364–66 (1987) (listing cases). A court may also find jurisdiction over the parent where the parent has greater control over the subsidiary "than normally associated with common ownership and directorship"

or where the subsidiary is merely an empty shell. *Donatelli*, 893 F.2d at 466. *See also Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir.1983) (greater control than normal); *Wells Fargo*, 556 F.2d at 421 (where subsidiary is a mere shell); *cf.*, Restatement (Second) of the Conflict of Laws § 52 cmt. b (personal jurisdiction over the parent exists "if the parent so controls and dominates the subsidiary as in effect to disregard the latter's independent corporate existence"). In this case, it would appear entirely reasonable to attribute any contacts of the eight subsidiary corporations to Clover, on the grounds either that Clover exerted greater than normal control over its subsidiaries, or that the subsidiaries acted as agents for Clover, or that the subsidiaries were merely empty shells. To begin with, each of the nine corporations has its principal place of business at 23 West Park Avenue in Merchantville, New Jersey 08109.[1] (Pl.'s Ex. T, Defendants' Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents [hereinafter "Def's Resp. to Interrog."], at No. 2) Each corporation has the same telephone number: (609) 6624757. (*Id.*) The Clover Defendants admit that Love and Zalkind are currently the sole two directors and are either president or vice president of both Clover Financial Corporation and of all of its eight subsidiaries. (*Id.*) The defendants also admit that Hogan was a director and vice president of each of the nine corporations, beginning at various dates from 1985 to 1988 and finishing in 1991 or 1992. (*Id.*) Furthermore, Wesleyan alleges, and the Clover Defendants do not rebut, that Zalkind, Love, and Hogan are the controlling shareholders of Clover. (Complaint, ¶¶ 28, 30, 32) Therefore, as to the corporate defendants, Wesleyan has presented evidence that Zalkind, Love, and Hogan currently are, or at one time were, simultaneously the controlling shareholders, directors, and officers of the nine corporations. While they contend that each of the six limited partnerships dissolved in 1996, the Clover Defendants acknowledge that each of the limited partnerships had the same address and telephone number as the corporate defendants and that each limited partnership had as its general partner one of the subsidiary corporations. (*Id.*) Based on this evidence, it does not appear to offend due process principles to treat the nine defendant corporations and the six defendant limited partnerships as a single entity for the jurisdictional inquiry. Finally, if there is personal jurisdiction over these entities, then there is also personal jurisdiction over the three individuals, Zalkind, Love, and Hogan, who are the alleged controlling principals, sole shareholders, sole directors, and officers of the nine corporate defendants, *See, e.g.*, *Dakota Indus., Inc. v. Ever Best Ltd.*, 28 F.3d 910, 915 (8th Cir.1994) (two shareholders who both owned one-third of the shares of a corporation with forum contacts and who were extensively involved in running the corporation were also subject to personal jurisdiction); *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 522–23 (9th Cir.1989) (corporation's two 50% shareholders who were its only officers and directors purposefully directed their activities toward the forum and thereby were subject to personal jurisdiction where their corporation solicited business from forum residents). Consequently, we treat the Clover Defendants as a single entity for our jurisdictional inquiry.

■ Turning now to the substantive matter of whether personal jurisdiction exists over the Clover Defendants, we find that a comparison of the allegations in this case with the facts of *Burger King* supports a finding of personal jurisdiction over the Clover Defendants. In *Burger King* the Supreme Court noted that a nonresident defendant franchisee had personally obligated himself to the restaurant franchisor to make payments exceeding $1 million over a 20–year franchise relationship. In this case, the Clover Defendants allegedly issued securities

---

1. · Clover Financial Corporation and its subsidiaries Resource Investment Corporation, Aurora Management Corporation, Gladstone Management Corporation, Fleetwood Management Corporation, Dome Management Corporation, Greystone Management Corporation, and Action Management Corporation are all allegedly incorporated under the laws of New Jersey. (Complaint, ¶¶ 13–27) The subsidiary Somerset Management Corporation is allegedly incorporated under the laws of South Carolina. (*Id.*, ¶ 20)

valued well in excess of the amounts at issue in *Burger King*. While the length of the parties' relationship in this case was not as long as the 20-year franchise relationship agreed to by the parties in *Burger King*, it nevertheless spanned several years beginning with Wesleyan's initial investment in the Clover Securities during the period between 1986 through 1989 and ending with the sale of the real estate underlying the Clover Securities in 1994.

During these years the Clover Defendants allegedly communicated frequently and voluminously with Wesleyan by telephone and mail. Zalkind testified that he spoke with Wesleyan's pension fund general director, Leland Crist, an Indiana resident, by telephone in regard to each of the seven investments by Wesleyan in Clover Securities. (Zalkind Dep., p. 26) In its response brief, Wesleyan contends that, as a result of its creditor or equity interest in each of the Clover Securities, it was entitled to periodic payments and periodic reports regarding the taxes, finances, and operations of the properties and that the Clover Defendants repeatedly sent such payments and reports to Wesleyan in Indiana. (Pl.'s Resp. Br., p. 5) As illustrative of the continual communications that the Clover Defendants directed toward it, Wesleyan proffers letters related to GP Apartment L.P. dated June 5, 1990, April 30, 1991, March 26, 1992, and March 24, 1994 that the Clover Defendants allegedly sent to Wesleyan. *See, e.g.,* Pl.'s Resp. Br., Ex. F, G, H, and I. The Clover Defendants do not rebut Wesleyan's allegations of these telephone and mail communications. Instead, the Clover Defendants cite *Federated Rural Electric Insurance Corp. v. Inland Power and Light Co.,* 18 F.3d 389, 395 (7th Cir.1994), for the proposition that "making telephone calls and mailing payments into the forum state are insufficient bases for jurisdiction." That proposition, however, was not the court's holding. Rather, the court merely noted that prior cases had held that proposition. The cases cited in *Federated Rural,* all decided prior to *Burger King,* cannot still be considered good law in the wake of that Supreme Court case. As the Court specifically stated in *Burger King:*

> Jurisdiction ... may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, *it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state line, thus obviating the need for physical presence within a State in which business is conducted.* So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

471 U.S. at 476, 105 S.Ct. at 2184 (emphasis added). Rather than deciding *Federated Rural* on the defendants' lack of physical presence in the forum state, that is on the purposeful availment prong of the due process analysis, the Seventh Circuit instead appears to have decided the case under the second inquiry, namely whether subjecting the defendant to personal jurisdiction would comport with traditional notions of fair play and substantial justice. As the court stated:

> [T]he interests of Wisconsin and the convenience of the parties weigh in favor of declining to assert jurisdiction. Plaintiff no longer has a business presence in Wisconsin, having moved its headquarters to Kansas in 1982. Defendant, all the witnesses, and all documentary evidence are in the Pacific Northwest.

18 F.3d at 395. Consequently, we do not find *Federated Rural* to require us to ignore the Clover Defendants' telephone and mail contacts with the forum.

Additional evidence of the "continuing obligations" between the Clover Defendants and Wesleyan is the contractual modifications and amendments that Wesleyan negotiated with some of the Clover Defendants. For example, Wesleyan agreed to extend the maturity date of the Marina Park mortgage and agreed to defer the payments of certain interest until the maturity date. (Complaint, ¶ 40) Wesleyan agreed to defer certain interest due under the Indian Hills promissory

note. (*Id.*, ¶¶ 50, 51). Wesleyan also agreed to an assignment of an additional 5 percent of the Hampton Forest mortgage. (*Id.*, ¶ 83) These subsequent negotiations and the eventual modifications and amendments to the parties' contracts further evidence an extensive and long-term contractual relation between parties of a kind which the Court in *Burger King* found necessarily to establish personal jurisdiction over a nonresident defendant.

As the Court stated in *Burger King*, "where the defendant 'deliberately' has engaged in significant activities within a State, or has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigating in that forum as well." 471 U.S. at 475–76, 105 S.Ct. at 2184 (omitting internal citations). It cannot seriously be claimed that the Clover Defendants should not reasonably have anticipated that their extensive dealings with Wesleyan as joint venturers, as partners, and as mortgagors could result in their being haled into this forum.

Even if Wesleyan and the Clover Defendants' contractual relationship were not sufficiently lengthy and involved as to create "continuing obligations" between the parties, other alleged circumstances of the transactions between the parties suggest that the Clover Defendants established minimum contacts with Indiana. Even analyzed as a discreet contract, each real estate securities transaction established minimum contacts of the Clover Defendants with this forum because the Clover Defendants allegedly solicited Wesleyan's participation in the transactions. The Seventh Circuit has held that a defendant's "active solicitation, even if for just a single contract, amount[s] to purposeful establishment of contacts with [a] forum that easily satisfies the dictates of due process." *Daniel J. Hartwig Assocs., Inc. v. Kanner*, 913 F.2d 1213, 1218 (7th Cir.1990) (citing *Madison Consulting Group v. South Carolina*, 752 F.2d 1193 (7th Cir.1985)). In

*Hartwig Associates* a Wisconsin environmental consulting firm sued a Pennsylvania attorney in federal district court in Wisconsin to recover fees for consulting services rendered. The Seventh Circuit found that the district court had personal jurisdiction over the nonresident defendant in part on the basis that the defendant solicited the plaintiff's services. *Hartwig Associates*, 913 F.2d at 1218. In *Madison Consulting* the plaintiff, another Wisconsin environmental consulting firm, brought suit against the State of South Carolina and a corporation controlled by that state for breach of contract. The court found that the defendants had no jurisdictionally significant contacts with the forum other than the contract itself Nevertheless, the Seventh Circuit found personal jurisdiction to exist because the defendants initiated negotiations with the consulting firm by telephone and paid a firm partner to travel to the East Coast to pursue the negotiations. *Madison Consulting*, 752 F.2d at 1203. The court found that the defendants had purposefully established minimum contacts with the forum "[b]y so actively reaching out to solicit the services of a Wisconsin partnership in connection with this contract." *Id.*

As with the defendants in *Hartwig Associates* and *Madison Consulting*, the Clover Defendants allegedly solicited Wesleyan to purchase the Clover Securities. Wesleyan alleges that the Clover Defendants engaged First Albany, a New York corporation and a co-defendant in this action, as an agent to help sell the Clover Securities and that they did so in part because they knew that a sales agent of First Albany, Charles Wallace, was chairman of Wesleyan's Investment Committee. (Complaint, ¶¶ 8, 9, 10, 37, 45, 55, 67, 71, 79, and 135) The Clover Defendants acknowledge that First Albany introduced Wesleyan to the Clover Defendants and was involved in each of the seven transactions underlying Wesleyan's claims. (Defs' Mot. Br., p. 5) In his deposition Zalkind admitted that the Clover Defendants sent brochures to Wesleyan in order to solicit its purchase of the Clover Securities. (Zalkind Dep., p. 25) The Clover Defendants' solicitation of Wesleyan's business is also suggested by Zalkind, Love, and Hogan's alleged 1988 invitation of Wesleyan's board of directors to meet with them at the

Merchantville, N.J., offices of the Clover Defendants. (Pl.'s Resp. Br., Ex. S, Minutes of the Wesleyan Pension Fund Investment Committee for October 25 & 26, 1988) Love testified that the purpose of the meeting "was for them to get to hear about their investments and for them to get to know us a little better personally." (Love Dep., p. 14) Under Seventh Circuit case law, this kind of alleged solicitation of a forum resident's business establishes a sufficient contact in the forum to subject the nonresident defendant to personal jurisdiction.

Another basis for finding personal jurisdiction over the Clover Defendants, even if we were not to find "continuing obligations" between the parties, is the Clover Defendants' alleged use of in-state agents in their dealings with Wesleyan. In *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572 (7th Cir.1994), the Seventh Circuit held that a district court properly exercised jurisdiction over a defendant foreign corporation where the defendant's only contact with the forum was the visit by its president to negotiate a contract. As the court reasoned, "[b]y its conduct Aceros had purposefully availed itself of the privilege of conducting business in Indiana; by that same conduct it invoked the benefits and protections of the laws of Indiana." *Id.* at 580–81. *See also Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1215–16 (7th Cir.1984) (holding that discussions in Illinois leading to contract sufficient for specific jurisdiction); *Neiman v. Rudolf Wolff & Co.*, 619 F.2d 1189, 1193 (7th Cir.), *cert. denied*, 449 U.S. 920, 101 S.Ct. 319, 66 L.Ed.2d 148 (1980) (holding that personal jurisdiction existed where employee of defendant came to forum for lunch meeting, and meeting constituted bulk of negotiations that led to formation of contract); *Wisconsin Elec. Mfg. Co., Inc. v. Pennant Prods., Inc.*, 619 F.2d 676, 677 (7th Cir.1980) (holding that personal jurisdiction over nonresident defendant existed where agents of defendant made two visits to forum that were significant in formation of contract). Wesleyan alleges that the Clover Defendants engaged First Albany to be their sales agent and that First Albany accomplished its representation of the Clover Defendants's interests with the help of its in-state agent Charles Wallace. The Clover Defendants contend that First Albany was not acting as its agent. In his affidavit, Zalkind testifies that Wallace was at all times an employee of First Albany and not of the Clover Defendants. (Zalkind Aff., ¶ 7) However, to the extent that the Clover Defendants engaged First Albany to represent it as a sales agent in its dealings with Wesleyan and to the extent that Wallace involved himself in such dealings, which Wesleyan alleges, then Wallace would appear to have been furthering the interests of the Clover Defendants. At the very least, an contestable issue of fact exists as to whether Wallace should be considered to have acted in an agency capacity on behalf of the Clover Defendants. Any factual dispute as to Wallace's role as an agent of the Clover Defendants should be resolved in favor of Wesleyan as the party asserting personal jurisdiction. *See Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1215 (7th Cir.1984) (a court must construe all facts concerning jurisdiction in favor of the nonmovant, including disputed or contested facts); *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987).

Wesleyan alleges that a second agent conducting business in the forum on behalf of the Clover Defendants was Leland Crist, the former general director of Wesleyan's pension fund. Crist testified that from the time of Wesleyan's first purchase of Clover Securities in connection with Marina Park Apartments in January 1986 through the end of his service as general director of the fund, Crist generally represented the Clover Defendants and promoted the sale of their investments to other church pension funds. (Pl.'s Resp. Br., Ex. W, Crist Aff., ¶ 7) As part of his service as an agent of the Clover Defendants, Crist traveled to the East Coast a number of times to inspect properties owned or managed by the Clover Defendants. (*Id.*, ¶ 8) Throughout his time as general director of Wesleyan's pension fund, Crist was a resident of Indiana. (*Id.*, ¶ 3) Most significant for our analysis is evidence that, in addition to helping to solicit investors among other pension funds, Crist also apparently assisted the Clover Defendants in soliciting Wesleyan.

Zalkind testified that one of the Clover Defendants, though he did not remember which, paid Crist a $20,000 fee. (Zalkind Dep., pp. 30–33) A copy of a letter Zalkind sent to Crist in March 1988 suggests that the payment to Crist was for his role in connection with the acquisition of Grove Park Apartments in Raleigh, North Carolina, by the Grove Park Joint Venture. (Pl.'s Resp. Br., Ex. L) Somerset Management Corporation, one of the Clover Defendants, also issued a $20,000 check to Crist in June 1988. (Pl.'s Resp. Br., Ex. M) Zalkind testified that the June 1988 payment was for Crist's services in helping to close the purchase of Somerset Apartments by the Summerville Joint Venture, the joint venture between Somerset Management Corporation and Wesleyan. (Zalkind Dep., p. 36) Crist acknowledged that for his services in promoting the sale of Clover Securities, the Clover Defendants paid him a total of $40,000 in two $20,000 installments in 1988. (Pl.'s Resp. Br., Ex. W, Crist Aff., ¶ 9)

The Clover Defendants contend that Crist's receipt of two $20,000 payments does not give rise to an inference that Crist was an agent of the Clover Defendants. The Clover Defendants proffer an affidavit of an official of PNC Bank who testifies that the checks provided to Crist do not evidence an employment or agency relationship. *See* Defs' Mot. Br., Ex. B, Affidavit of Maureen Nicholas. Of course, this is not as much evidence as it is legal conclusion. Whether Crist acted as an agent of the Clover Defendants is a question of law for the Court to decide. As an additional argument, Zalkind states in his affidavit that "[a]s a Clover employee, I sent two checks to Leland Crist ('Crist'), for services he performed as an employee of Wesleyan Pension Fund ('WPF') in connection with the transactions involving the Grove Park Apartments and the Somerset Apartments." (Zalkind Aff., ¶ 6) Zalkind's argument is not persuasive because his testimony appears internally inconsistent. (Perhaps what Zalkind means, but cannot say, is that the two $20,000 checks were actually bribes, rather than payments "for services.") In any event, the Clover Defendants do not proffer any probative evidence to refute Wesleyan's allegation that Grist

acted as an agent for them. Furthermore, under the standards for deciding a motion under Rule 12(b)(2), the Court must construe all facts concerning jurisdiction in favor of the non-movant, including disputed or contested facts. *Deluxe Ice Cream*, 726 F.2d at 1215; *Turnock*, 816 F.2d at 333.

Even if we were to find that neither First Albany's Charles Wallace nor Wesleyan's own Leland Grist acted on behalf of the Clover Defendants with respect to any of the seven real estate securities transactions, the Clover Defendants do not rebut in any manner Wesleyan's allegation that the Clover Defendants sent a corporate employee, Roger Fay, to Indiana in 1994 to discuss the pending sale of the real estate properties comprising the Clover Securities. Fay allegedly traveled to Indiana to meet with Wesleyan and to discuss the proposed sale of the seven real estate properties underlying Wesleyan's Clover Securities. (Pl.'s Ex. T, Def.'s Resp. to Interrog., at No. 3) Zalkind and Love have both acknowledged that they spoke with Fay prior to his coming to Indiana about the visit, and Zalkind testified that he probably also spoke with Fay about the visit on Fay's return from Indiana. (Zalkind Dep., p. 19; Love Dep., p. 26)

Seventh Circuit case law in which personal jurisdiction has been found to exist over a nonresident defendant based on the forum activities of the defendant's agent all involves agents conducting pre-contractual negotiations. *See NUCOR, Deluxe Ice Cream, Neiman,* and *Wisconsin Electrical, supra.* Fay's visit to Indiana allegedly involved negotiations surrounding the sale of the properties comprising the Clover Securities. Therefore, in a sense, Fay's visit concerned the conclusion of the parties' business relationship rather than its commencement. This distinction, however, does not render the above-referenced case law inapplicable. A party purposefully avails itself of the laws and benefits of a forum state no less when it engages in the kind of activities that the Clover Defendants undertook through the agency of Fay than when it engages in pre-contractual negotiations in a forum office or hotel as occurred in *NUCOR.* Pre-contractual negotiations as well as visits necessitated

by issues relating to performance or termination of the contract represent significant aspects of the parties' overall business relationship. Roger Fay's visit to Indiana to discuss,the sale of the seven real estate properties underlying the Clover Securities was clearly a foreseeable future consequence of Wesleyan's initial investment in those securities. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985); *Enviroplan, Inc. v. Western Farmers Elec. Coop.*, 900 F.Supp. 1055, 1060–61 (S.D.Ind.1995).

Wesleyan alleges contacts with the forum by Zalkind, Love, and Hogan personally as well. Wesleyan alleges that in order to induce it to invest in the Clover Securities issued by Indian Hills L.P., Zalkind, Love, and Hogan executed and delivered to Wesleyan both a personal guaranty of those securities and a security agreement pursuant to which Zalkind, Love, and Hogan deposited a letter of credit with an Indiana escrow agent. (Complaint, ¶¶ 426, 427) In depositing their letter of credit, the individual defendants were clearly availing themselves of the benefits and protections of Indiana law and consequently were conducting business in the forum. The Clover Defendants contend that these personal guaranties are insufficient to subject Zalkind, Love, and Hogan to the personal jurisdiction of this Court. Because we have already determined that the Clover Defendants may be treated as a group for purposes of a jurisdictional inquiry, the argument against subjecting Zalkind, Love, and Hogan in their individual capacities makes a distinction that we already have concluded is not warranted. Even ignoring this distinction, the Clover Defendants still contend that "the alleged guarantees and security agreements have nothing to do with the precise claims advanced by [Wesleyan] and do not serve as the basis for [Wesleyan's] claims, in the sense that this is not a suit to enforce the guaranty or the security agreement." (Defs' Mot. Br., p. 25) In advancing this argument, the Clover Defendants elevate form over substance. Wesleyan clearly is seeking to hold Zalkind, Love, and Hogan personally accountable for losses it sustained in part as a result of its loan to Indian Hills L.P. Wesleyan alleges that it invested $1.6 million in the

limited partnership and received in exchange a note in the principal amount of $1,600,000, pursuant to which Wesleyan was to receive current and deferred interest upon the sale of the investment property. (Complaint, ¶ 48) Wesleyan further alleges that it ultimately received only $1,050,000 upon the sale of the investment property in July 1994 and that the limited partnership has no remaining assets. (*Id.*, ¶ 52) While Wesleyan may not have premised its complaint strictly on claims to enforce the individual defendants' personal guaranties, we find that Wesleyan's claims against Zalkind, Love, and Hogan in regard to its loan to Indian Hills L.P. clearly arise in part out of the individual defendants' personal guaranties. *See Marathon Metallic Bldg. Co. v. Mountain Empire Const. Co.*, 653 F.2d 921 (5th Cir.1981) (personal jurisdiction existed over corporate officer and shareholder who had mailed a continuing guaranty into the forum in order to induce the plaintiff to extend credit to his company); *Forsythe v. Overmyer*, 576 F.2d 779 (9th Cir.), *cert. denied*, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978) (recognizing personal jurisdiction over a nonresident guarantor with strong personal interest in the underlying contract between his company and the plaintiff); *Kimball International Inc. v. Warmack*, No. IP88–460–C, 1989 WL 432179 (S.D.Ind. March 22, 1989) (nonresident guarantors subject to personal jurisdiction where they owned stock in company benefiting from the guaranty and guaranty was given expressly to obtain extension of credit for company). Furthermore, because we have found the seven real estate securities transactions to be related, we find that Zalkind, Love, and Hogan's contacts with the forum in regard to one of those transactions may be considered a contact with respect to the other transactions as well.

In a supplemental submission to the Court, filed April 3, 1997, the Clover Defendants argue that the recently decided Seventh Circuit case, *RAR Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272 (7th Cir.1997), holds that specific personal jurisdiction must be analyzed on a "transaction by transaction basis" and, therefore, precludes a finding of personal jurisdiction over the Clover Defendants. We

assume that the Clover Defendants would argue that the contacts established in regard to any one of the transactions would be insufficient to support personal jurisdiction. In *RAR* an Illinois corporation sued a Scottish corporation for breach of contract. The plaintiff had entered into a contract to buy four diesel locomotive engines from a second Scottish corporation and had contracted with the defendant to retrieve the engines, dismantle them, and package them for transportation to Detroit, Michigan. During shipment, two of the engines and other goods being shipped in the engines' containers were damaged. The Seventh Circuit held that the Scottish defendant was not subject to personal jurisdiction in Illinois. Limiting its inquiry to the question of specific jurisdiction (any contention of general jurisdiction had been waived), the court found that the previous contacts that the defendant had with Illinois in other transactions with RAR were not sufficiently related to the parties' dispute so as to support a finding of minimum contacts. As the court stated: "Unless their contacts are continuous and systematic enough to rise to the level of general jurisdiction, individuals and corporations must be able to conduct interstate business confident that transactions in one context will not come back to haunt them unexpectedly in another." 107 F.3d at 1278. We do not think that *RAR*, however, compels a different jurisdictional conclusion with respect to the Clover Defendants. Significantly, the *RAR* court distinguished the facts of that case from *Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276 (7th Cir. 1990), in which the court considered the past course of dealing between two parties and found a "continuing relationship or obligation" between them that warranted personal jurisdiction. *Id.* at 284. The *RAR* court noted that a finding of a continuous relationship or obligation must "be considered in light of the similarities between the disputed transaction and prior transactions." 107 F.3d at 1279. The *RAR* court found no personal jurisdiction over the Scottish corporation because the prior contacts with Illinois did not relate to the contract at issue.

The primary similarity between the disputed contract and the prior contracts between RAR and Turner is the fact that RAR and Turner are again the parties. In terms of both the goods and services exchanged and the geographical context of the transactions, the disputed contract is quiet unlike the past agreements.

*Id.* In the instant case, however, we cannot say that the transactions at issue are fundamentally dissimilar. Each involved the purchase of alleged real estate securities by Wesleyan from one of the Clover Defendants, all of which, allegedly are controlled by the same three individual defendants, Zalkind, Love, and Hogan. More important, the plaintiff in *RAR* did not sue the defendant for any of the prior transactions, whereas Wesleyan's claims against the Clover Defendants include all seven transactions; there are no "prior contracts" at issue in this litigation. Consequently, *RAR* is easily distinguishable from the instant case.

A review of the Clover Defendants' extensive contacts with Indiana, including their repeated solicitation of Wesleyan to make substantial investments in the seven Clover Securities at issue in this case, the duration of the parties' business relationship over several years, the substantial negotiations involved in that relationship, the Clover Defendants' engagement of at least one and perhaps three agents to conduct business in the forum with respect to Wesleyan's investment in the Clover Securities, and Zalkind, Love, and Hogan's individual contacts with the forum in the form of their personal guaranties of the Indian Hills promissory note all compel the conclusion that the Clover Defendants established minimum contacts with Indiana and purposefully availed themselves of the benefits and privilege of conducting business in Indiana.

Finally, as stated above, if minimum contacts through some purposeful availment exist, we must determine whether jurisdiction would be consistent with traditional notions of fair play and substantial justice. *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184. *See also Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 52 (7th Cir.1996). In determining whether personal jurisdiction comports with traditional notions of fair play and substantial justice, a court "may evaluate the burden

on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interests of the several States in furthering fundamental substantive social policies." *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184 (quoting *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564) (internal quotations omitted). In this case, because the several corporations and limited partnerships that make up the Clover Defendants boil down to the three individual defendants Zalkind, Love, and Hogan, we find that the burden on the defendants to litigate this cause of action in this forum would not be so onerous as to constitute a denial of due process. Moreover, the State of Indiana would have a great interest in adjudicating this cause of action. First, Plaintiff is an Indiana corporation residing in this State and is a pension fund most likely with fund beneficiaries who are also residents of this State. Second, Plaintiff has alleged that the nonresident defendants violated Indiana securities laws. A State has a clear interest in providing a forum for the vindication of rights established under its own laws. For these reasons, it is clear that haling the Clover Defendants into this court is consistent with traditional notions of fair play and substantial justice. In *Burger King* the Supreme Court stated, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.". *Id.* at 477, 105 S.Ct. at 2184–85. In this case, the Clover Defendants fail to present any such compelling case or considerations that would compel a contrary jurisdictional conclusion.

### IV. Rule 12(b)(6) Standard

For purposes of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), all well-pleaded allegations are presumed to be true. *Whirlpool Financial Corp. v. GN Holdings, Inc.,* 67 F.3d 605, 608 (7th Cir.1995); *McTigue v. City of Chicago,* 60 F.3d 381, 382 (7th Cir.1995); *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 644 (7th Cir.1995). A court must view those allegations in the light most favorable to the plaintiff, *Richmond,* 52 F.3d at 644; *Gould v. Artisoft, Inc.,* 1 F.3d 544, 546 (7th Cir.1993), and accept as true all reasonable inferences to be drawn from those allegations. *Whirlpool Financial Corp.,* 67 F.3d at 608; *McTigue,* 60 F.3d at 382. Dismissal of a complaint for failure to state a claim is granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Richmond,* 52 F.3d at 644 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)); *Chaney v. Suburban Bus Division of the Regional Transportation Authority,* 52 F.3d 623, 627 (7th Cir.1995).

### V. Discussion of Rule 12(b)(6) Motion

The Clover Defendants move dismiss for failure to state a claim Wesleyan's claims that the Clover Defendants (1) violated Indiana securities law, Ind.Code § 23–2–1–1 *et seq.,* by offering and selling unregistered securities, by issuing, offering, and selling securities by unregistered broker-dealers and agents, and by using untrue or misleading statements in connection with the sale of those securities; (2) violated the Indiana Racketeer Influenced and Corrupt Organization Act, Ind.Code § 35–45–6–1 to 6–2; and (3) committed constructive fraud. We review the sufficiency of Wesleyan's allegations with respect to each claim.

#### A. *Violations of Indiana Securities Laws*

Under Indiana's Securities Regulation Act ("the Securities Act"), Ind.Code § 23–2–1–1 *et seq.,* it is unlawful for any person to offer or sell an unregistered security in Indiana unless the security or the transaction is exempted under the Act. Ind.Code § 23–2–1–3. In its Complaint Wesleyan alleges that its interest in each of the seven real estate transactions qualifies as securities under section 23–2–1–1(k) of the Securities Act. (Complaint, Counts 1, 6, 11, 21, 27, and 33) Wesleyan alleges that because the Clover Defendants allegedly sold these securities to Wesleyan without registering them with the Indiana Securities Commissioner, the Clover

Defendants violated the Securities Act. In their motion to dismiss, the Clover Defendants contend that, assuming *arguendo* that Wesleyan's interest in the seven real estate transactions constitutes securities under the Securities Act, section 23–2–1–2(b)(8) of the Act exempted them from having to register those securities. That section exempts from the Act's registration requirement those securities offered or sold to:

> a bank, a savings institution, a trust company, an insurance company, an investment company (as defined in the Investment Company Act of 1940 (15 U.S.C. 80a–1 through 80a–52)), a pension or profit-sharing trust, or other financial institution or institutional buyer, or to a broker-dealer, whether the purchaser is acting for itself or in a fiduciary capacity.

Ind.Code § 23–2–1–2(b)(8). The Clover Defendants contend that under the wording of the exemption Wesleyan qualifies as an "institutional buyer" because, by its own admission, it has holdings of $42,149,000. *See* Complaint ¶ 96.

The Clover Defendants seek support for this interpretation in a 1990 opinion of the Indiana Securities Commissioner ("the Commissioner"), finding that a "qualified institutional buyer" ("QIB") under Rule 144A of the U.S. Securities Exchange Commission ("SEC") met the definition of "institutional buyer" under the exemption provision of the Indiana Securities Act. In the Commissioner's opinion, the purpose of the Indiana exemption is "to provide an exemption from registration for financial institutions, broker dealers and other sophisticated institutional investors that *regularly buy and sell securities in sufficient quantities and/or are in the business of buying and selling securities.*" 1A Blue Sky L. Rep. (CCH) ¶ 24,675 (Dec. 1990) (emphasis added).

> Under (i) of the Rule 144A definition, each entity owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity. Therefore, each entity is regularly in the market with a substantial quantity of investments.

*Id.* The Clover Defendants contend that Wesleyan necessarily is in the business of buying and selling securities or necessarily buys and sells securities in quantities sufficient to meet the exemption because it has holdings of $42,149,000. Looking to interpretative materials from other states that, like Indiana, have modeled their securities regulations acts on the Uniform Securities Act of 1956, the Clover Defendants contend that analogous exemption provisions have thresholds for the application of similar exemptions of less than $42 million. For example, the Clover Defendants argue that the Nebraska securities commissioner has established a $5 million threshold, *see* Nebraska Sec. Bureau, Interpretative Op. No. 10, 2 Blue Sky L. Rep. (CCH) ¶ 37,461 (as revised July 1, 1985), and that the Washington commissioner has established a $10 million threshold, *see* Wash. Sec. Div. Interpretative Statement No. IS–11, 3 Blue Sky L. Rep. (CCH) ¶ 61,810C (Jan. 1, 1991).

The burden of demonstrating that an exemption applies rests squarely on the party invoking the exemption. *See* Ind.Code § 23–2–1–16(j); *see also Kahn v. State*, 493 N.E.2d 790, 798 (Ind.App.), *trans. denied* (Nov. 18, 1986); *Tremps v. Ascot Oils, Inc.*, 561 F.2d 41, 46 (7th Cir.1977). In this case, we find that the Clover Defendants have not met their burden of showing that Wesleyan meets the definition of "institutional buyer." Rather than accept the Clover Defendants' position that an entity's holding of $42 million necessarily qualifies that entity as an institutional buyer, the Court is persuaded that qualification as an institutional buyer under the Indiana exemption provision depends primarily on the financial sophistication of the entity. As the Commissioner stated in her 1990 opinion, the purpose of the exemption is "to provide an exemption from registration for financial institutions, broker dealers and *other sophisticated institutional investors.*" While there are no reported Indiana cases that interpret the term "institutional buyer" as it is used in section 23–2–1–2(b)(8), case law interpreting analogous exemption provisions from other state securities acts similarly based on the Uniform Securities Act of 1956 also supports an interpretation that focuses on the sophistication of the entity. For example, in *Briggs v. Sterner*, 529 F.Supp.

1155 (S.D.Iowa 1981), the court considered whether the plaintiff, a sole trustee of a retirement plan organized in the form of a trust, qualified as a "pension or profit-sharing trust" under a nearly identical to section 23–2–1–2(b)(8).[2] Finding no judicial or regulatory interpretations of the Iowa exemption, the court looked to the Uniform Securities Act for guidance.

> Draftsmen of the Act indicate that the "obvious justification for this exemption is that institutional investors and broker-dealers are 'sophisticated' buyers who do not need the protection of registration." This would appear to limit the applicability of [the exemption] to financial institutions, institutional buyers and broker-dealers, or "financially sophisticated organizations which are 'able to fend for themselves' and do not need the protection of registration."
>
> Accordingly, the financial sophistication of the trust may provide the key to a determination of the availability of the exemption. Other factors to be considered in assessing the institutional buyer status of a particular pension and profit sharing trust are the net worth and the nature and amount of trust assets.

*Id.* at 1174 (internal citations omitted).

For their part, the Clover Defendants do not offer any conclusive argument for treating Wesleyan as an institutional buyer. First, the Clover Defendants garner no support for their contention from the Commissioner's 1990 Opinion finding that QIBs under SEC Rule 144A qualify as institutional buyers under section 23–2–1–2(b)(8). Under Rule 144A, QIBs must have at least $100 million and Wesleyan's alleged holdings are less than half that amount. Therefore, the Clover Defendants' statement that Wesleyan necessarily buys and sells securities in sufficient quantities and/or is in the business of buying and selling securities is wholly conclusory. *See* Defs' Mot. Br., p. 8. Second, the regulatory interpretations of exemption provisions from other states are not persuasive because the exemption provisions themselves are distinguishable from section 23–2–1–2(b)(8). For example, Nebraska's statutory institutional investor exemption differs from Indiana's by adding to the list of eligible investors "individual accredited investors" who qualify for the exemption solely by family wealth or income without the need for any showing of sophistication or investment experience. Neb.Rev.Stat. 8–1111(8), 2 Blue Sky L. Rep. (CCH) ¶ 37,114 (1995). The Washington interpretive opinion does indicate that an institutional buyer can include certain entities with a net worth of only $10 million. *See* Wash. Sec. Div. Interpretation Statements Nos. IS–11, 3 Blue Sky L. Rep. (CCH) ¶ 61,810C (Jan. 1, 1991). We do not find this interpretation persuasive in itself, especially in light of the opinion's conclusion that an "institutional buyer" includes "other entities . . . of sufficient expertise and financial strength to bear the risk of purchasing unregistered securities." *Id.* The Clover Defendants do not offer any persuasive argument that Wesleyan's alleged holdings of $42 million are enough to qualify it as an exempt entity. Because the exempt status of Wesleyan under section 23–2–1–2(b)(8) will turn on its financial sophistication and because that determination will require a factual inquiry, the Clover Defendants' motion to dismiss Wesleyan's claims under the Securities Act must be denied.[3]

**B.  *Constructive Fraud***

▪ The Clover Defendants next move to dismiss Wesleyan's claim that they engaged in constructive fraud in their solicitation of Wesleyan's investment in each of the seven real estate transactions. (Complaint, Counts

---

**2.** At the time of the case, the Iowa provision, Iowa Code section 502.203, tracking the Uniform Securities Act, exempted the following transactions:

> Any offer or sale to a bank, savings institution, trust company, investment company . . . pension or profit sharing trust, or other financial institution or institutional buyer, or to a broker-dealer, whether the purchaser is acting for itself for in a fiduciary capacity.

**3.** Because the Clover Defendants do not meet their burden of establishing that Wesleyan qualifies as an exempt entity under section 23–2–1–2(b)(8), we need not address the defendants' argument, premised on such an exemption, that they were not required to register as "agents" or "broker-dealers." *See* Defs' Mot. Br., p. 9 n. 6.

5, 10, 15, 20, 26, 27, 28, and 39) In their motion to dismiss, the Clover Defendants contend that Wesleyan has failed to allege one of the requisite elements of a claim for constructive fraud, namely that the Clover Defendants owed a duty of care to Wesleyan. (Defs' Mot. Br., p. 10) The elements of constructive fraud under Indiana law are:

(1) a duty existing by virtue of the relationship between the parties; (2) representations or omissions made in violation of that duty; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate cause thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party.

*Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996); *Biberstine v. New York Blower Co.*, 625 N.E.2d 1308, 1315 (Ind.App. 5 Dist.1993); cf. *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844, 848 (Ind.App.1990), *trans. denied* (listing first four elements). The Clover Defendants contend that Wesleyan's role as an investor in the Clover Securities does not create a fiduciary relation between Plaintiff and them. In support of their argument, the Clover Defendants cite *Lycan v. Walters,* 904 F.Supp. 884 (S.D.Ind.1995), and *Comfax v. North American Van Lines, Inc.,* 587 N.E.2d 118 (Ind.App. 1 Dist.1992), for the proposition that parties to a real estate transaction do not on that basis alone owe a fiduciary duty to each other. In *Lycan* the plaintiffs, investors who contributed capital to a joint venture to purchase the assets of a manufacturer in bankruptcy proceedings, sued the defendants for securities fraud when the transaction failed. The court granted summary judgment to the defendants after finding that the plaintiffs offered no evidence suggesting that a confidential or fiduciary relationship existed between the parties. 904 F.Supp. at 898. In *Comfax,* the plaintiff, a nationwide moving and storage company, negotiated with the defendant, a local distributor of computer software, for the purchase of computer programs. After the plaintiff brought a breach of contract action against a distributor, the distributor counterclaimed on, among other grounds, constructive fraud. The court of appeals affirmed a grant of summary judgment on this counterclaim,

finding the defendants failed to demonstrate a special relationship between the parties. As the court stated, "the parties were involved in an arm's length, contractual arrangement and the requisite fiduciary relationship may not be predicated on such an arrangement." 587 N.E.2d at 125–26.

Both of these cases, however, addressed the question of fiduciary duty in the context of a motion for summary judgment. Both courts ruled that the party against whom the constructive fraud claim was asserted was entitled to judgment because the party asserting the claim had not established by evidence that a fiduciary relationship or other special relationship existed between the parties. In this case, the Clover Defendants have not moved for summary judgment and do not contend that Wesleyan has failed to present evidence. Instead, the Clover Defendants contend that Wesleyan has failed to allege an essential element of the claim. In its Complaint, however, Wesleyan alleges that the Clover Defendants owed it a fiduciary because:

(1) the Clover Defendants held themselves out as having superior knowledge of investing in real estate (*see* Complaint ¶ 133, 174, 213, 252, 300, 348, and 396);

(2) the Clover Defendants hired Defendants First Albany to act as their placement agent knowing that Defendant First Albany had a fiduciary relationship with Plaintiff of which they could take advantage (*see* Complaint, ¶ 135, 176, 215, 254, 302, 350, and 398); and

(3) one or more of the Clover Defendants employed Wesleyan's General Director Leland Crist to act as its agent (*see* Complaint, ¶ 405).

As we stated above, for purposes of a motion to dismiss under Rule 12(b)(6), the court must accept the plaintiff's factual allegations as true and draw all reasonable inference in the plaintiff's favor. *Whirlpool Financial Corp.,* 67 F.3d at 608; *McTigue,* 60 F.3d at 382; *Richmond,* 52 F.3d at 644. Dismissal is proper only where it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief *Conley v. Gibson,* 355 U.S. 41, 45–46,

78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429–30 (7th Cir.1996). We cannot conclude solely on the basis of the pleadings that Wesleyan will be unable to establish that the Clover Defendants owed it some form of duty. As the Supreme Court, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). In this case, Wesleyan alleges among other things that the Clover Defendants had direct and indirect control over two members of Wesleyan's putatively neutral investment committee and that, because of this control, the Clover Defendants were not engaged in arm's length dealings with Wesleyan. The Court must not undertake to determine whether a fiduciary relationship in fact existed between the partes without a proper factual record. Consequently, the Court denies the Clover Defendants' motion to dismiss Wesleyan's constructive fraud claim.

### C. *Indiana RICO Act*

Next, the Clover Defendants move to dismiss Count 41 of Wesleyan's Complaint, which alleges a violation of the Indiana Racketeer Influenced and Corrupt Organizations Act ("RICO"), Ind.Code §§ 35–45–6–1 and 35–45–6–2.[4] Indiana's RICO statute is patterned after the federal anti-racketeering law of the same name. *See 4447 Corp. v. Goldsmith,* 504 N.E.2d 559, 560 (Ind.1987), *rev'd on other grounds,* 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989); *State v. Allen,* 646 N.E.2d 965, 968 (Ind.App. 2 Dist.1995). The federal RICO statute was enacted over 25 years ago and was originally designed to fight organized crime. *Gagan v. American Cablevision, Inc.,* 77 F.3d 951, 958 (7th Cir. 1996) (citing *Statement of Findings and Purpose,* Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922–23 (1970)). *See also Buck Creek Coal, Inc. v. United Work-*

ers of America, 917 F.Supp. 601, 609 (S.D.Ind.1995) ("RICO was enacted in part to eliminate infiltration of organized crime and racketeering activities into legitimate businesses or organization"). The federal act prohibits various forms of infiltration of legitimate business "enterprises" involved in interstate commerce through a "pattern of racketeering activity." 18 U.S.C. § 1962. The Indiana RICO statute more or less tracks the substantive provisions of the federal statute with the exception that it does not require interstate commercial activity as an element of the offense. Indiana Code section 35–45–6–2 states:

A person:

(1) Who has knowingly or intentionally received any proceeds directly or indirectly derived from a pattern of racketeering activity, and who uses or invests those proceeds or the proceeds derived from them to acquire an interest in property or to establish or to operate an enterprise;

(2) Who through a pattern of racketeering activity, knowingly or intentionally acquires or maintains, either directly or indirectly, an interest in or control of property or an enterprise; or

(3) Who is employed by or associated with an enterprise, and who knowingly or intentionally conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activity;

commits corrupt business influence, a Class C felony.

Ind.Code § 35–45–6–2. In their motion brief, the Clover Defendants contend that Wesleyan's Indiana RICO claim must be dismissed because Wesleyan (1) does not properly plead a pattern of racketeering activity, and (2) does not allege a RICO enterprise distinct and separate from the alleged RICO persons. (Defs' Mot. Br., p. 13) We address these putative defects in turn.

The Clover Defendants' first basis for dismissal, a failure to plead a pattern of racketeering activity, can be disposed of easily. In Count 41 Wesleyan alleges that the

---

4. Wesleyan brings its RICO claim pursuant to the Indiana Civil Remedies for Racketeering Activity Act, which gives a private right of action to

any person who sustains injury to his property by reason of a corrupt business influence. *See* Ind. Code § 34–4–30.5–5.

Clover Defendants engaged in unlawful conduct constituting a "pattern of racketeering" by engaging in, among other things, at least seven real estate transactions, each of which allegedly violated various provisions of the Indiana Securities Act, including section 23–2–1–3, section 23–2–1–8, and section 23–2–1–12 of the Indiana Code. (Complaint, ¶ 438) The Clover Defendants contend that the Clover Securities and the seven real estate transactions underlying them are exempt from the requirements of Indiana's Securities Act under section 23–2–1–2(b)(8) of the Act because of Wesleyan's status as an institutional buyer. (Defs' Mot. Br., p. 13 n. 9) However, because we have ruled that the Clover Defendants have not met their burden of demonstrating the application of the exemption, we cannot say that Wesleyan will be unable to prevail in its claims under the Securities Act or that those claims will not also support Wesleyan's allegations of a pattern of racketeering that would entitle them to relief under the Indiana RICO statute.

■ The Clover Defendants' second basis for dismissing Wesleyan's RICO claim is that Wesleyan does not allege a RICO enterprise distinct and separate from the alleged RICO persons. The Clover Defendants argument is derived from case law construing section 1962(c) of the federal act. Because section 35–45–6–2(3) of the Indiana RICO statute predominately mirrors the language of the section 1962(c) of the federal statute, we find the distinctiveness requirement of the federal provision should also apply to claims premised on section 35–45–6–2(3).[5] In its response brief, Wesleyan notes that the distinctiveness requirement would apply only to a claim brought under subsection (3) of the Indiana RICO statute but not to claims brought under subsections (1) or (2). (Pl.'s Resp. Br., p. 29) Wesleyan's contention appears to be supported by case law. See, e.g., Haroco v. American Nat. Bank & Trust Co. of Chicago, 747 F.2d 384, 402 (7th Cir.1984), aff'd on other grounds, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) ("Subsection (a) does not contain any of the language in subsection (c) which suggests that the liable person and the enterprise must be separate"); Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1307 (7th Cir.1987), cert. denied, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989) ("Accordingly, we hold that, like subsection (a), subsection (b) does not require the existence of an enterprise separate and distinct from the person sought to be held liable"); see also David B. Smith & Terrance G. Reed, Civil RICO, ¶ 3.07, p. 3–78 (1997) (citing case law).[6] In their reply brief, the Clover Defendants do not contend that the distinctiveness requirement would apply to a claim brought under either of the other two RICO provisions. Instead, the Clover Defendants contend that Wesleyan does not state a claim under the other two provisions of the Indiana RICO statute because "Plaintiff must further allege facts sufficient to identify a RICO enterprise that was acquired through use of illegal activities or money obtained from such illegal activities." (Defs' Reply Br., p. 9) In other words, the Clover Defendants contend that Wesleyan's RICO claims fail because Wesleyan alleges that it

---

5. Section 1962(c) of the federal RICO statute provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debts.

18 U.S.C. § 1962(c).

6. In its pleadings, Wesleyan does not state under which provision or provisions of the Indiana Act it is bringing its claim. The three subsections of section 35–45–6–2 correspond respectively to 18 U.S.C. section 1962(a), (b), and (c) and commentary on the federal statute sheds some light on

how the subsections of the federal and state statutes work together.

> Subsections (a), (b), and (c) were "designed to work together to deal with the three different ways in which organized crime infiltrates and corrupts legitimate organizations." The basic purpose of section 1962(a) was to prevent racketeers from using their ill-gotten gains to operate, or purchase controlling interests in, legitimate businesses. The purpose of section 1962(b) was to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking. Section 1962(c), the most often charged RICO offense, was intended to prevent the operation of a legitimate business or union through racketeering.

David B. Smith & Terrance G. Reed, Civil RICO, ¶ 5.01, p. 5–2 (1997) (footnote omitted).

was the victim of the racketeering activity whereas liability under the Indiana statute is predicated on the *enterprise* being the victim of the racketeering. (*Id.*)

We need not address these last contentions because the Clover Defendants raise them for the first time in their reply brief, thereby preventing Wesleyan from responding. Arguments raised for the first time in a reply brief are waived. *Hall v. Cropmate,* 887 F.Supp. 1193, 1199 (S.D.Ind.1995) ("It is well established that new arguments may not be first raised in a reply brief—a party must state all of its reasons in support of a motion the first time around"); *Rockrohr v. Norfolk Southern Corp.,* 797 F.Supp. 664, 665 (N.D.Ind.1992); *see also Wilson v. O'Leary,* 895 F.2d 378, 384 (7th Cir.1990) (applying same principle to appellate arguments). Because we deem the Clover Defendants' arguments regarding sections 35–45–6–2(1) and 35–45–6–2(2) waived, we construe the Clover Defendants' motion to dismiss as solely directed against any RICO claim Wesleyan may be asserting under section 35–45–6–2(3) of the Indiana Act.

In Count 41 Wesleyan alleges that the corporate defendants Clover and Resource and the individual defendants Zalkind, Love, and Hogan are each a "person" as that term is used in Ind.Code section 35–45–6–2. *See* Complaint, ¶¶ 434–35. Wesleyan also alleges the existence of three "enterprises" as that term is used in section 35–45–6–2 of the Indiana RICO statute: (1) Clover, (2) Resource, and (3) the combination of Clover, Resource, Zalkind, Love, and Hogan. *See Id.,* ¶¶ 436–37. The Clover Defendants contend that none of the alleged enterprises meets the federal distinctiveness requirement that we read into the Indiana provision. In regard to suits brought under the federal RICO statute, the Seventh Circuit stated in *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640 (7th Cir.1995):

> To be liable under § 1962(c), [a] person "must participate in the operation or management of the enterprise itself," and must

be separate and distinct from the enterprise. Indeed, "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."

*Id.* at 646 (internal citations omitted). *See also Haroco,* 747 F.2d at 400 ("The use of the terms 'employed by' and 'associate with' appears to contemplate a person distinct from the enterprise"). We examine the question in regard to each of the alleged enterprises, remembering Wesleyan's allegations that Zalkind, Love, and Hogan are the controlling principals of Clover and that Resource is either a wholly owned subsidiary of Clover or is itself controlled by Zalkind, Love, and Hogan. The first two alleged enterprises easily satisfy the distinctiveness requirement. If Clover is the alleged enterprise, then Zalkind, Love, Hogan, and Resource (either as a subsidiary or sister corporation) could be the persons participating in the operation or management of Clover. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.,* 46 F.3d 258, 268 (3rd Cir.1995) ("when officers and/or employees operate and manage a legitimate corporation, and use it to conduct, through interstate commerce, a pattern of racketeering activity, those defendant persons are properly liable under Sec.1962(c)"); *United States v. Robinson,* 8 F.3d 398, 407 (7th Cir.1993) (determining that the president and controlling shareholder of a corporation-enterprise was a separate and distinct entity from that enterprise); *Ashland Oil, Inc., v. Arnett,* 875 F.2d 1271, 1280 (7th Cir.1989) (determining that the defendants, owners of Arnett Oil, were sufficiently distinct from their incorporated business to be treated as separate entities). If Resource is the alleged enterprise, then Zalkind, Love, Hogan, and Clover (either as a parent or sister corporation) could be the RICO persons. *See Haroco,* 747 F.2d at 402 ("The subsection requires only some separate and distinct existence for the person and the enterprise, and a subsidiary corporation is certainly a legal entity distinct from its parent")[7]; *Elysian Fed. Sav. Bank v. First*

---

7. *Haroco's* statement that a subsidiary corporation can constitute an enterprise through which a defendant corporation engages in racketeering activity had been rejected by several other cir-

cuits. *See* David B. Smith & Terrance G. Reed, *Civil RICO,* ¶ 3.07, p. 3–82.2 (1997). Nevertheless, *Haroco* remains the law of this circuit.

*Interregional Equity Corp.,* 713 F.Supp. 737, 758–59 (D.N.J.1989), *overruled on other grounds, Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682 (3rd Cir.1991) (parent corporation can be a "person" separate and distinct from its wholly-owned subsidiary, the "enterprise"); *Philadelphia TMC, Inc., v. AT & T Information Systems,* 651 F.Supp. 169, 173 (E.D.Pa.1986) (same). The alleged group or association-in-fact enterprise consisting of Clover, Resource, Zalkind, Love, and Hogan also survives the Clover Defendants' motion to dismiss. The Clover Defendants cite *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640 (7th Cir.1995), for the proposition that, when alleging a group or association-in-fact enterprise, a plaintiff must identify the enterprise with more particularity than simply naming a string of entities. As the district court noted in initially dismissing the complaint:

> Richmond cannot meet the demands of RICO just by naming a string of entities that assertedly make up an 'association in fact' (even though under proper circumstances such an association can indeed by an 'enterprise' for RICO purposes). Instead, it is necessary that the complaint identify such an 'association in fact' that is meaningfully different in the RICO context from the units that go to make it up[.]

*Richmond v. Nationwide Cassel L.P.,* 847 F.Supp. 88, 91 (N.D.Ill.1994). While the complaint in *Richmond* did not provide any allegations concerning structure, continuity, or common course of conduct by the alleged enterprises, *see Richmond,* 52 F.3d at 645, the same cannot be said of Wesleyan's Complaint, which provides ample allegations regarding these matters in its 85 pages of pleadings. The Clover Defendants also contend that an individual corporation cannot be held liable as a "person" that conducts its own affairs through a pattern of racketeering. *See Richmond,* 52 F.3d at 646. *See also Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339 (2nd Cir.1994) (affirming dismissal of RICO claim for failure to satisfy distinctiveness requirement where the alleged enterprise was comprised of a bank and two of its loan officers; distinctiveness requirement may not be circumvented merely by alleging that the

RICO enterprise consists of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant). The Clover Defendants' case law, however, does not preclude a plaintiff from asserting a group or association-in-fact enterprise made up, not just of a corporation and its officers and employees, but of two sister corporations or a parent and subsidiary corporation and their officers and employees. Whether Wesleyan will be able to succeed in its state RICO claim will come down to a question of evidence. At this point in the litigation, we cannot say that it is beyond doubt that Wesleyan can prove no set of facts in support of its claim which would entitle it to relief Consequently, we deny the Clover Defendants' motion to dismiss Wesleyan's state RICO claim.

### C. *ERISA preemption*

Finally, the Court summarily rejects as a basis for dismissal the Clover Defendants' contention that Wesleyan's claims of misrepresentation, failure to disclose conflict of interest, constructive fraud, and violations of the Indiana RICO statute are preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Again, the Clover Defendants did not raise this line of argument until their reply brief As stated above, arguments raised for the first time in a reply brief are waived. *See Hall,* 887 F.Supp. at 1199; *Rockrohr,* 797 F.Supp. at 665. The Clover Defendants are free to advance their ERISA preemption argument in a motion for summary judgment, if such a contention is warranted at that point in the litigation.

### VI. Conclusion

For the foregoing reasons, the Court **DENIES** in their entirety the Clover Defendants' Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction and Rule 12(b)(6) motion to dismiss for failure to state claim. The Court **DENIES AS MOOT** Wesleyan's motion to bar materials outside the pleadings and motion to strike false affidavit, the Clover Defendants' motion to stay the proceedings, and the parties' respective motions to

certify questions of Indiana law to the Supreme Court of Indiana.