KANNE, Circuit Judge.
 

 This case poses the difficult question of how closely connected a cause of action must be to a defendant’s contacts with a forum to justify personal jurisdiction over the defendant in that forum. RAR, Inc. (“RAR”) is an Illinois corporation that, between 1991 and 1993, sold engine parts many times from its offices in Illinois to Turner Diesel, Ltd. (“Turner”), a Scottish corporation. In 1993, RAR agreed to buy four diesel, locomotive engines from another Scottish company. RAR arranged for Turner, however, to get the engines in Scotland, dismantle and purchase various parts from the engines, and then assist in the packing of the engines for transportation to Detroit. Everything went fine until some of the transported items were damaged during shipment. RAR sued Turner for breach of contract, alleging that Turner improperly packed the engines. Turner moved for dismissal, however, claiming that the Illinois federal court lacked personal jurisdiction over Turner. The District Court agreed and dismissed the complaint without prejudice. Because Turner’s prior contacts with Illinois have no substantive bearing on this action or on the contract at issue, we hold that the District Court did not have personal jurisdiction,.and we therefore affirm the dismissal.
 

 
 *-309
 
 I. History
 

 The basic facts in this case are essentially uncontested. The following is our distillation of- the relevant facts from the complaint and the uncontroverted affidavits submitted to the District Court. As the plaintiff, RAR is entitled to have any conflicts in the affidavits resolved in its favor.
 
 See Turnock v. Cope,
 
 816 F.2d 332, 333 (7th. Cir.1987).
 

 Turner is a Scottish corporation headquartered in Aberdeen, Scotland. Turner does not have any offices, employees, or bank accounts in Illinois, and it does not manufacture products for general sale in Illinois. Between February 1, 1991 and June 1, 1993, however, Turner purchased various engine parts from RAR, which has its headquarters in Lisle, Illinois. On at least 100 occasions, Turner asked RAR to submit its best price on engines or engine parts that Turner wanted to purchase. Turner would typically fax its request for bids to RAR, or Turner would send representatives to meet personally with RAR’s sales representative in Illinois. These bids led to more than 20 separate contracts for the sale of engine parts from RAR to Turner. RAR would usually send the parts from Illinois to wherever Turner wanted the parts.
 

 In early 1992, Turner notified RAR that another Scottish company, Wil-Rig U.K., Ltd. (“Wil-Rig”), was interested in selling four engines that RAR might want to buy for resale in the United States. On two separate visits to Scotland in 1992, an RAR representative inspected the engines at the Wil-Rig yard. RAR and Wil-Rig finally negotiated a contract for the engines in April 1993. RAR and Turner representatives, meanwhile, began to discuss — both in transatlantic phone conversations and in person in Scotland— whether Turner wanted to purchase a power pack and a turbocharger from the engines that RAR had just acquired. Around June 1, 1993, RAR and Turner orally agreed that Turner would get the engines from Wil-Rig in Scotland, strip the power pack and turbocharger to keep for itself, and then send the engines (along with other engine parts owned by Turner as compensation for the power pack and turbocharger) back to the United States. Turner was also to include in the shipment 18 cylinder heads it had earlier purchased from RAR but was now returning under RAR’s warranty. All of the goods were to be shipped to Detroit — not Illinois— because RAR lacked storage facilities for two of the engines it had purchased. RAR claims it planned to transport the remainder of the shipment back to Illinois on its own, but Turner denies knowing that any of the items were to end up in Illinois.
 

 Turner did get the engines from Wil-Rig and stripped the power pack and turbocharger as planned. Turner then subcontracted with another Scottish corporation, All Timberlines, Ltd., to package all of the items for shipment to Detroit. The items were transported in two shipments, each composed of two containers. During one of the shipments, an engine broke loose in its container, allegedly flipping over the truck on an interstate in Ohio and thus damaging other goods in the container. An engine in the other container, meanwhile, also broke loose during shipment, allegedly causing damage to the engine itself as well as to other items in that container.
 

 RAR sued Turner for breach of contract in Illinois state court, praying for damages of $395,000. Turner, as a citizen of a foreign state, removed the matter to the U.S. District Court for the Northern District of Illinois under 28 U.S.C. § 1332(a)(2). Turner then moved to dismiss for lack of personal jurisdiction and on
 
 forum non conveniens
 
 grounds. The District Court granted the personal jurisdiction motion,
 
 RAR, Inc. v. Turner Diesel, Ltd.,
 
 No. 95 C 7418, 1996 WL 207248 (N.D.Ill. April 24, 1996), and RAR now appeals.
 

 II. Analysis
 

 We review
 
 de novo
 
 a district court’s legal conclusion regarding whether personal jurisdiction exists over a defendant.
 
 Klump v. Duffus,
 
 71 F.3d 1368, 1371 (7th Cir.1995),
 
 cert. denied,
 
 — U.S.—, 116 S.Ct. 2523, 135 L.Ed.2d 1047 (1996). A federal district court exercising diversity jurisdiction has personal jurisdiction, of course, “only if a court of the state in which it sits would have such jurisdiction.”
 
 See id.
 
 When determin
 
 *-308
 
 ing whether state courts would have jurisdiction, however, federal courts are under no obligation to defer to state court interpretations of
 
 federal
 
 law.
 
 Cf. Erie R.R. Co. v. Tompkins,
 
 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) (“Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.”). Although state court precedent is binding upon us regarding issues of state law, it is only persuasive authority on matters of federal law.
 
 [1]
 

 See Industrial Consultants, Inc. v. H.S. Equities, Inc.,
 
 646 F.2d 746, 749 (2d Cir.1981).
 

 The plaintiff, moreover, has the burden of demonstrating the existence of personal jurisdiction.
 
 See McIlwee v. ADM Industries, Inc.,
 
 17 F.3d 222, 223 (7th Cir. 1994). Three distinct obstacles to personal jurisdiction must generally be examined: 1) state statutory law, 2) state constitutional law, and 3) federal constitutional law. Turning first to Illinois statutory law, the Illinois long-arm statute provides that an Illinois court “may ... exercise jurisdiction on any ... basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States.” 735 Ill.Comp.Stat. 5/2-209(c). Because the Illinois statute authorizes personal jurisdiction to the constitutional limits, the three inquiries mentioned above collapse into two constitutional inquiries— one state and one federal. And we must at least try to address the state constitutional issue first because the doctrine of constitutional avoidance counsels that “federal courts should avoid addressing federal constitutional issues when it is possible to dispose of a ease on pendent state grounds.”
 
 Triple G Landfills, Inc. v. Board of Comm ’rs of Fountain County, Ind.,
 
 977 F.2d 287, 291 (7th Cir.1992);
 
 see Siler v. Louisville & Nashville R.R. Co.,
 
 213 U.S. 175, 193, 29 S.Ct. 451, 455-56, 53 L.Ed. 753 (1909).
 

 The Illinois Supreme Court has made clear that the Illinois due process guarantee is not necessarily. co-extensive with federal due process protections. Although the Illinois Supreme Court “may, in construing the Illinois Constitution’s guarantee of due process, look for guidance and inspiration to constructions of the Federal due process clause by the Federal courts, the final conclusions on how the due process guarantee of the Illinois Constitution should be construed are for [the Illinois] court to draw.”
 
 Rollins v. Ellwood,
 
 141 Ill.2d 244, 152 Ill.Dec. 384, 398, 565 N.E.2d 1302, 1316 (1990). Unfortunately, however, the Illinois courts have given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction.
 
 [2]
 
 We are told that “[j]urisdiction is to be asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant’s acts which occur in Illinois or which affect interests located in Illinois.”
 
 Id.
 
 Beyond this general norm, however, we have scant case law with which to work.
 

 We do know that Illinois courts have upheld (under the state constitution) personal jurisdiction “over a non-resident corporate purchaser engaged in a commercial relationship with an Illinois corporation through the placing of purchase orders to the plaintiff in Illinois for products manufactured in Illinois.”
 
 Autotech Controls Corp. v. K.J. Elec. Corp.,
 
 256 Ill.App.3d 721, 195 Ill.Dec. 526, 531-32, 628 N.E.2d 990, 995-96 (1993);
 
 see G.M. Signs, Inc. v. Kirb Signs, Inc.,
 
 231 Ill.App.3d 339, 172 Ill.Dec. 933, 935-36, 596 N.E.2d 212, 214-15 (1992). Although that sounds a lot like Turner’s relationship with RAR, those cases involved causes of action
 
 *-307
 
 arising directly from the Illinois commercial relationship. As mentioned above, however, a key issue in this case is how closely related a cause of action must be to such a commercial relationship to justify personal jurisdiction in that action. We are unaware of — and the parties have not cited — any Illinois ease decided on state constitutional grounds that deals with this question. We are hesitant to venture unguided into Illinois state constitutional law, and certification to the Illinois Supreme Court would be impractical for issues arising as frequently as personal jurisdiction. Despite our best efforts, therefore, we cannot find any definitive state grounds on which to dispose of this case. As we have done before, we must move on to address the federal constitutional issues directly.
 
 See, e.g., Klump,
 
 71 F.3d at 1371-72
 
 &
 
 n. 4.
 

 The Due Process Clause of the Fourteenth Amendment limits when a state may assert in personam jurisdiction over nonresident individuals and corporations.
 
 See Pennoyer v. Neff, 95
 
 U.S. 714, 733, 24 L.Ed. 565 (1878). A defendant must have “certain minimum contacts with [the state] such that the maintenance of the suit does not offend ‘traditional notions of fair play and substantial justice.’ ”
 
 International Shoe Co. v. Washington,
 
 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting
 
 Milliken v. Meyer,
 
 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). What that standard means in a particular case depends on whether the state asserts “general” or “specific” jurisdiction. Specific jurisdiction refers to jurisdiction over a defendant in a suit “arising out of or related to the defendant’s contacts with the forum.”
 
 Helicopteros Nacionales de Colombia, S.A. v. Hall,
 
 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984). General jurisdiction, meanwhile,.is for suits neither arising out of nor related to the defendant’s contacts, and it is permitted only where the defendant has “continuous and systematic general business contacts” with the forum.
 
 Id.
 
 at 416, 104 S.Ct. at 1873. RAR has never alleged that Turner has such systematic contacts with Illinois. RAR has thus waived any general jurisdiction argument,
 
 see Giotis v. Apollo of the Ozarks, Inc.,
 
 800 F.2d 660, 663 (7th Cir. 1986), and we may focus exclusively on specific jurisdiction.
 

 In specific jurisdiction cases, we must decide whether a defendant has “purposefully established minimum contacts within the forum State” and consider whether, by traditional standards, those contacts would make personal jurisdiction reasonable and fair under the circumstances.
 
 See Burger King Corp. v. Rudzewicz,
 
 471 U.S. 462, 476-77, 105 S.Ct. 2174, 2184-85, 85 L.Ed.2d 528 (1985). Crucial to the minimum contacts analysis is showing that the defendant “should reasonably anticipate being haled into court [in the forum State],”
 
 id.
 
 at 474, 105 S.Ct. at 2183 (quoting
 
 World-Wide Volkswagen Corp. v. Woodson,
 
 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)), because the defendant has “purposefully avail[ed] itself of the privilege of conducting activities” there,
 
 Burger King,
 
 471 U.S. at 474-75, 105 S.Ct. at 2183 (quoting
 
 Hanson v. Denckla,
 
 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)). To give a concrete example, an out-of-state party’s contract with an in-state party is alone not enough to establish the requisite minimum contacts.
 
 See Burger King,
 
 471 U.S. at 478, 105 S.Ct. at 2185. Rather, “prior negotiations and contemplated future consequences, along with the terms of the contract and the parties’ actual course of dealing” must indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant.
 
 Id.
 
 at 479, 105 S.Ct. at 2185-86.
 

 Remember, however, that specific jurisdiction requires that the suit “arise out of’ or “be related to” these minimum contacts with the forum state. We cannot simply aggregate all of a defendant’s contacts with a state — no matter how dissimilar in terms of geography, time, or substance — as evidence of the constitutionally-required minimum contacts. As the Supreme Court stated in
 
 World-Wide Volkswagen,
 
 the Due Process Clause of the Fourteenth Amendment “gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.”
 
 World
 
 
 *-306
 

 Wide Volkswagen,
 
 444 U.S. at 297, 100 S.Ct. at 567. Potential defendants should have some control over — and certainly should not be surprised by — the jurisdictional consequences of their actions. Thus, when conducting business with a forum in one context, potential defendants should not have to wonder whether some aggregation of other past and future forum contacts will render them liable to suit there. Unless their contacts are continuous and systematic enough to rise to the level of general jurisdiction, individuals and corporations must be able to conduct interstate business confident that transactions in one context will not come back to haunt them unexpectedly in another.
 

 This still leaves the obvious question, however, of how to separate those contacts that a suit “arises out of’ or “relates to” from those contacts entirely unconnected to a suit. Indeed, the Supreme Court in
 
 Helicópteros
 
 explicitly avoided deciding “what sort of tie between a cause of action and a defendant’s contacts with a forum is necessary” for specific jurisdiction.
 
 Helicopteros,
 
 466 U.S. at 415 n. 10, 104 S.Ct. at 1872 n. 10. In the present case, RAR argues that Turner’s repeated contacts with RAR in Illinois between 1991 and 1993 are all connected to the present cause of action and therefore relevant to minimum contacts analysis. “The existence of this type of long-term commercial relationship between the parties” is sufficient, according to RAR, to meet the minimum contacts test.
 
 See
 
 Appellant’s Br. at 16. RAR argues, in effect, for a hybrid between specific and general jurisdiction where, though
 
 all
 
 of a defendant’s forum contacts would not be relevant for minimum contacts, all of a defendant’s contacts
 
 with a specific plaintiff
 
 would be.
 

 Admittedly, RAR’s suit is, in a certain sense, related to Turner’s contacts with Illinois, if only because Turner never would have come to handle the engines in Scotland had it not previously dealt with RAR in Illinois. We do not think, however, that using such a loose causal connection between a suit and a defendant’s forum contacts as the basis for personal jurisdiction comports with fair play and substantial justice. As the First Circuit put it, specific jurisdiction is not appropriate “merely because a plaintiffs cause of action arose out of the general relationship between the parties; rather, the action must
 
 directly arise
 
 out of the specific contacts between the defendant and the forum state.”
 
 Sawtelle v. Farrell,
 
 70 F.3d 1381, 1389 (1st Cir.1995) (emphasis added).
 

 We must, of course, draw a line somewhere, and we agree with the Third Circuit that, in a breach of contract case, it is only the “dealings
 
 between the parties in regard to the disputed contract”
 
 that are relevant to minimum contacts analysis.
 
 Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,
 
 75 F.3d 147, 153 (3d Cir.1996). Even that line will not always be a bright one. Real world commercial interactions are rarely neatly-compartmentalized by particular contract. When parties engage in an ongoing commercial relationship involving repeated transactions over time, it may be difficult to say exactly which past dealings regard a specific contract. The same negotiations, dealings, or other interactions could have some connection to a number of contracts between the parties. To be relevant for personal jurisdiction, however, past contacts involving the forum state should either bear on the substantive legal dispute between the parties or inform the court regarding the economic substance of the contract.
 
 Cf. Rush v. Savchuk,
 
 444 U.S. 320, 329, 100 S.Ct. 571, 577-78, 62 L.Ed.2d 516 (1980) (finding no
 
 quasi in rem
 
 jurisdiction in part because defendant’s contacts with forum were neither “the subject matter of the case” nor “related to the operative facts of the negligence action”); Lea Brilmayer,
 
 Related Contacts and Personal Jurisdiction,
 
 101 Harv.L.Rev. 1444 (1988). Applying any less substantive of a standard would divorce due process analysis from considerations of a state’s proper interest in regulating conduct and adjudicating disputes.
 
 See World-Wide Volkswagen,
 
 444 U.S. at 292, 100 S.Ct. at 564-65; Brilmayer,
 
 supra,
 
 at 1457. And applying any less straightforward of a standard (though our standard still leaves many ambiguous cases) would make potential defendants, when structuring transactions, perpetually uncertain as to what causal connections
 
 *-305
 
 courts might draw between past contacts and current litigation.
 

 Consider, for example, the Michigan franchisee in
 
 Burger King
 
 who was forced by-Burger King to litigate a breach of contract claim near the company’s Florida headquarters. The franchisee and Burger King had signed multiple related agreements when establishing their relationship, but the Supreme Court considered
 
 all
 
 of the parties’ negotiations and interactions when deciding the personal jurisdiction issue.
 
 See Burger King,
 
 471 U.S. at 478-82, 105 S.Ct. at 2185-87. The Court could hardly have separated the negotiations by their relationship to specific agreements because the agreements were part of an interrelated package dedicated to one overarching goal
 
 (i.e.,
 
 setting up the franchisee to sell hamburgers in Michigan). By contrast, some contacts of the franchisee with Burger King in Florida would surely be out of bounds for establishing personal jurisdiction. Had the franchisee, for instance, developed the idea of acquiring a franchise after buying and eating Whoppers in Florida, we highly doubt the Court would have found those purchases relevant to the later franchise dispute. Importantly, our holding today would let the franchisee know
 
 why
 
 he can be confident the purchases do not make him suable in Florida, that is, because the hamburger purchases could have no substantive relationship either with any contract he might enter into with Burger King or with any dispute on such a contract.
 

 Our decision in
 
 Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.,
 
 906 F.2d 276 (7th Cir.1990), is not to the contrary. There we considered the past course of dealing between two parties and found a “continuing relationship or obligation” between them that warranted personal jurisdiction.
 
 Id.
 
 at 284. Our finding of a “continuing relationship or obligation” must, however, be considered in light of the similarities between the disputed transaction and prior transactions. The disputed transaction involved the same exchange of financial services as prior transactions, and the parties were even renewing a previously-arranged certificate of deposit.
 
 Id.
 
 at 278-79. Such strong similarities between transactions immediately suggest the substantive relevance of the past transactions. Not only might a later transaction incorporate understandings formed during prior transactions, but a suit regarding the later transaction might actually hinge on those prior understandings.
 

 In our case, Turner’s prior Illinois contacts tell the court nothing about RAR’s cause of action and shed little light even on the contract generally. The outcome of this particular breach of contract action, which involves allegations only of improper packing, will not turn on any facts developed from RAR’s prior forum contacts. Moreover, those prior contacts will hardly give the court any better understanding of the economic substance of the contract itself. The primary similarity between the disputed contract and the prior contracts between RAR and Turner is the fact that RAR and Turner are again the parties. In terms of both the goods and services exchanged and the geographical context of the transactions, the disputed contract is quite unlike the past agreements. Instead of RAR taking orders and shipping engine parts to Turner in Scotland, the two parties in effect swapped engine parts, with the further difference that Turner retrieved the engines from Wil-Rig, stripped parts from them, and then packaged everything for shipment. Most of the activity, including most of the negotiations, took place in Scotland, and the engines and parts were not even to be shipped to Illinois, but to Detroit. Although RAR claims Turner should have known parts were ultimately going to Illinois, Turner’s contractual obligation was limited to getting the items to the Motor City. The strongest argument for personal jurisdiction — that the shipment included cylinder heads Turner was returning to RAR from a prior Illinois purchase — is simply too weak to support personal jurisdiction. The inclusion of the cylinder heads in the shipment is, quite frankly, an incidental aspect of a transaction chiefly concerned with retrieving and packing Scottish engines and shipping them to Detroit.
 

 And if. Turner’s
 
 prior
 
 transactions do not count towards establishing minimum contacts for this suit, then it is hard to see what else could establish those contacts.
 
 *-304
 
 The contract at issue in this ease has no substantial connection with Illinois (other than RAR’s location there which alone is insufficient to support jurisdiction). We therefore find that Turner’s contacts with Illinois regarding this suit do not rise to the constitutionally-mandated minimum.
 

 The consequence of our holding is mitigated by the fact that personal jurisdiction is waivable and that parties can, through forum selection clauses and the like, easily contract around any rule we promulgate.
 
 See Burger King,
 
 471 U.S. at 472 n. 14, 105 S.Ct. at 2182 n. 14. In the absence of such contractual arrangements, however, due process requires that potential defendants have some measure of control and warning regarding where they may be haled to court, and the clearer and more predictable we can make jurisdictional rules, the better that interest is served.
 

 The District Court’s judgment dismissing RAR’S Suit ÍS AFFIRMED.
 

 [1]
 

 . If federal and state court interpretations of federal law differ, the possibility exists that a federal court exercising diversity jurisdiction will have to decide a case differently than a state court hearing the same case would. Although discouraging forum-shopping is one of the "twin aims” of the
 
 Erie
 
 doctrine,
 
 see Hanna v. Plumer,
 
 380 U.S. 460, 468, 85 S.Ct. 1136, 1142, 14 L.Ed.2d 8 (1965), it is nonetheless "beyond cavil that we are not bound by a state court's interpretation of federal law regardless of whether our jurisdiction is based on diversity of citizenship or a federal question,"
 
 Grantham v. Avondale Industries, Inc.,
 
 964 F.2d 471, 473 (5th Cir.1992).
 

 [2]
 

 . The Illinois Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws.” Ul.Const. art. 1, § 2.