**JOHNSON WORLDWIDE ASSOCIATES, INC., and Johnson Worldwide Associates Canada, Inc., Plaintiffs,**

v.

**The BRUNTON COMPANY, and Silva Production AB, Defendants.**

No. 96–C–0965.

United States District Court, E.D. Wisconsin.

May 8, 1998.

Peter J. Stone, Foley & Lardner, Milwaukee, WI, for plaintiffs.

John P. Frederickson, Nilles & Nilles, Milwaukee, WI, John E. Reilly, Kurt S. Lewis, Reilly & Purcell, Denver, CO, for defendants.

### DECISION AND ORDER

ADELMAN, District Judge.

Currently pending before me are motions brought by defendants, Silva Production AB and The Brunton Company under Federal Rule of Civil Procedure 12(b)(2) to dismiss for lack of personal jurisdiction. The Brunton Company also moves for a change of venue pursuant to rule 12(b)(3). For the reasons set forth below, all of these motions are denied.

## I. FACTUAL BACKGROUND

The following facts are derived from the Amended Complaint and from the parties' evidentiary submissions, as indicated. Additional facts will be discussed as necessary.

Plaintiffs Johnson Worldwide Associates, Inc., a Wisconsin corporation, and Johnson Worldwide Associates Canada, Inc., a Canadian corporation, filed this case in this district on August 23, 1996. Both plaintiffs (together referred to as "JWA") have their principal offices in Sturtevant, Wisconsin, which is within the territory of this district. JWA designs, develops, markets, sells, and distributes magnetic compasses in the United States and Canada. Amended Complaint at ¶ 1; JWA's Johnson–Leipold Decl. (Jan. 10, 1997) at ¶ 3.

Defendant Silva Production AB is a Swedish corporation with its principal place of business in Sollentuna, Sweden. Silva' Production designs, develops, manufactures, markets, and sells compasses worldwide. Silva' Production's Tillander Decl. (Oct. 31, 1996) at ¶¶ 1, 2, 6. Silva Production has never qualified to do business in Wisconsin; has never had a mailing address, telephone line or bank account in Wisconsin; owns no property in Wisconsin; and has no employees, officers or directors in Wisconsin. Id. at ¶¶ 7, 9, 10. It has no subsidiaries, affiliates, or agents doing business in Wisconsin. Id. at ¶ 8.

The contract underlying this lawsuit is one that originally had little connection to Wisconsin. Neither plaintiff was an original party to the contract. On December 20, 1973, Silva Production (then known as AB Instrumentverken) entered into a Supply and Know–How Licensing Agreement (the "licensing agreement") with Silva, Inc., an Indiana corporation located in La Porte, Indiana. The licensing agreement was negotiated and signed in Stockholm, Sweden, and provides that Indiana law applies to its terms. Id. at ¶¶ 4, 5; Johnson–Leipold Decl., Exh. A. Pursuant to the licensing agreement Silva Production provided compasses to Silva, Inc. in La Porte. Tillander Decl. at ¶ 5.

In approximately 1980, Silva, Inc. was purchased by and liquidated into JWA predecessor Johnson Wax Associates, Inc., a Delaware corporation located in Racine, Wisconsin. Johnson–Leipold Decl., Exh. B at 1. JWA succeeded to all of the rights and obligations of Silva, Inc., including the licensing agreement with Silva Production. Id. Johnson Wax then assigned all rights and obligations under the licensing agreement to its wholly-owned subsidiary Johnson Camping, Inc., a Delaware corporation with its principal office in Binghamton, New York. Id. Silva Production, Johnson Wax, and Johnson Camping then entered into a second agreement, dated September 23, 1981, which resolved various issues between the parties and amended certain terms of the licensing agreement. Id. at 1–5. The amendments extended the licensing agreement to September 23, 1996. Id. at 4. The September 23, 1981, agreement between Silva Production, Johnson Wax, and Johnson Camping provided that Wisconsin law applied to its terms. Id. at 5. It is unclear where the agreement was signed.

Johnson Wax became JWA. JWA then apparently reorganized at some point and Johnson Camping's separate identity may have disappeared, although that is unclear. See Johnson–Leipold Decl. at ¶ 4; Silva Production's Reply Memorandum (May 19, 1997) at 8. In any event, JWA now has three divisions operating out of Sturtevant: camping, fishing and marine, and diving. Johnson–Leipold Decl. at ¶ 4.

Pursuant to the licensing agreement, Silva Production manufactured and sold exclusively to JWA or its predecessors magnetic compasses for distribution, marketing and sale by JWA in the United States and Canada, including Wisconsin. Id. at ¶ 5. JWA used SILVA as a trade name; JWA owns all right, title and interest in and to the SILVA trade name and trademark in the United States and Canada with respect to compasses. Id. at ¶ 3. JWA's camping division is responsible for the SILVA compass. Id. at ¶ 4.

According to JWA, notwithstanding its assignment of the licensing agreement to Johnson Camping, the compass orders and pay-

ments to Silva Production all originated from JWA's Wisconsin offices and all decisions regarding the supply relationship with Silva Production were handled in Wisconsin as well. *Id.* at ¶¶ 8, 9. According to JWA, a "flurry of communications" occurred between JWA in Wisconsin and Silva Production in Sweden regarding their relationship, including letters from Silva Production addressed to employees of Johnson Wax and JWA in Racine. *Id.* at ¶¶ 10, 11; *see id.,* Exh. C. Representatives of Silva Production traveled to Wisconsin approximately eight to ten times from 1973 through 1996 to discuss issues regarding Silva Production's relationship with Johnson Camping, including the resolution of the current dispute. Tillander Decl. at ¶ 15.

· In February 1996 Silva Production bought all outstanding shares of defendant The Brunton Company, making Brunton its wholly-owned subsidiary. Brunton, a Wyoming corporation with its principal office in Riverton, Wyoming, still maintains a separate corporate identity from Silva Production. Brunton's Herron Decl. (Sept. 20, 1996) at ¶¶ 2, 4, 5. Brunton is engaged primarily in the business of manufacturing and marketing transits, telescopes, binoculars, rifle scopes, compasses, and related products. *Id.* at ¶ 3. Brunton has no office or manufacturing facility in Wisconsin and is not registered to do business in this state. *Id.* at ¶ 8. It sells its products through independent sales representatives, none of whom live in Wisconsin. The sales representative servicing Wisconsin lives and works in Illinois. *Id.* at ¶¶ 6, 10. Brunton advertises its products in national industry publications and through catalogs, brochures, and flyers, some of which find their way into Wisconsin. *Id.* at ¶¶ 7, 9.

In March 1996 Silva Production officials traveled to Wisconsin to discuss the licensing agreement and to offer to purchase the SILVA trademark from JWA. Johnson–Leipold Decl. at ¶ 12. (JWA apparently declined.) Silva Production then sent a letter dated March 15, 1996, and addressed to JWA in Sturtevant, Wisconsin, terminating the licensing agreement effective September 23, 1996. Johnson–Leipold Decl., Exh. D.

Silva Production and Brunton had decided to sell a line of magnetic compasses, manufactured by Silva Production and distributed by Brunton under the name "NEXUS". Herron Decl. at ¶ 12. To introduce Brunton's representatives to these new products, on or about July 29, 1996, Brunton sent a fax to its representatives in which it noted the expansion of its product line "to include Made in Sweden compass products trademarked 'Nexus' (formerly sold by Johnson Worldwide Associates as 'Silva')." *Id.,* Amended Complaint, Exh. 3; Johnson–Leipold Decl. at ¶ 21. The fax was not sent to anyone in Wisconsin. Brunton met with its representatives in Salt Lake City, Utah, in conjunction with the Outdoor Retailer Show in August 1996 to discuss the NEXUS product line. Herron Decl. at ¶ 12. Preliminary literature about and other promotion of the NEXUS line may have involved references by Brunton or Silva Production that the NEXUS products were the same as JWA's SILVA products, although that is a disputed point. *See, e.g.,* JWA's Arent Decl., Exh. H at Exh. 13, Exh. C at 21–22. According to JWA, the NEXUS line of compasses appears very similar to JWA's SILVA line and includes many of the same model names and numbers used by JWA. Amended Complaint at ¶¶ 19, 22.

Meanwhile, on July 5, 1996, Silva Production sent JWA in Wisconsin a letter indicating that it would not fill certain of JWA's outstanding orders for compasses. Johnson–Leipold Decl. at ¶ 14, Exh. F.

In this lawsuit, JWA alleges nine federal and state-law claims against Silva Production and Brunton based on the termination of its licensing agreement and the defendants' actions regarding the NEXUS line. Specific claims include trademark and trade dress infringement, fraudulent registration of a trademark by Silva Production, unfair competition, unjust enrichment, violation of the Wisconsin Fair Dealership Law, Wis.Stat. § 135.01 *et seq.,* breach of contract, and tortious interference with the contracts between JWA and its customers.

## II. PERSONAL JURISDICTION

 Defendants contend that this court has no personal jurisdiction over them and

the case therefore must be dismissed.[1] Plaintiffs have the burden of proving personal jurisdiction exists, *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997), although the burden is not a heavy one, 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 (2d ed.1990). In support of jurisdiction the plaintiffs have proffered the allegations in their complaint as well as deposition testimony and affidavits, which the court may receive and weigh to assist it in determining the jurisdictional facts. *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173, 1176 (7th Cir.1971); *Cram v. Medical College of Wis.*, 927 F.Supp. 316, 319 (E.D.Wis.1996). The plaintiff need only make a prima facie showing that personal jurisdiction exists. *O'Hare*, 437 F.2d at 1176; *Cram*, 927 F.Supp. at 319. As the plaintiff, JWA is entitled to have all inferences from and any conflicts in the affidavits resolved in its favor. *RAR*, 107 F.3d at 1275.

The plaintiffs' complaint involves both federal and state-law claims. Whether this court has personal jurisdiction over the federal claims depends on whether the defendants are amenable to process from this court. *Lifeway Foods, Inc. v. Fresh Made, Inc.*, 940 F.Supp. 1316, 1318 (N.D.Ill.1996). I look first at the applicable federal statute to see what it says about the matter. *See* Fed. R.Civ.P. 4(k)(1)(D);[2] *United States v. De Ortiz*, 910 F.2d 376, 382 (7th Cir.1990). The basis for plaintiffs' four federal trademark-related claims is the Lanham Act, 15 U.S.C. § 1051 *et seq.* Plaintiffs do not dispute that the jurisdiction provision of the Lanham Act, 15 U.S.C. § 1121, does not authorize nation-wide service of process. Plaintiffs' Memorandum in Opposition (April 30, 1997) at 10; *see Kohler Co. v. Titon Indus., Inc.*, 948 F.Supp. 815, 817 (E.D.Wis.1996) (so holding).

Personal jurisdiction will be established then if the defendants would be subject to the jurisdiction of the Wisconsin courts. Fed.R.Civ.P. 4(k)(1)(A). Therefore, personal jurisdiction over the federal claims depends on whether plaintiffs' allegations and evidence satisfy the requirements of Wisconsin's long-arm statute, Wis.Stat. § 801.05, and whether personal jurisdiction comports with Fourteenth Amendment due process requirements. *Kohler*, 948 F.Supp. at 821. If the court may exercise personal jurisdiction over the federal question claims, then it may exercise supplemental jurisdiction over the related state law claims. 28 U.S.C. § 1367(a). (As the parties are diverse, I also would have personal jurisdiction over the state law claims if the requirements of the long-arm statute and Fourteenth Amendment due process are met in regard to those claims.)

## A. The Wisconsin Long–Arm Statute

The Wisconsin long-arm statute is to be liberally construed in favor of exercising jurisdiction. *Schroeder v. Raich*, 89 Wis.2d 588, 593, 278 N.W.2d 871 (1979). The statute is intended to confer jurisdiction to the extent allowed by due process requirements. *State ex rel. N.R.Z. v. G.L.C.*, 152 Wis.2d 97, 104–05, 447 N.W.2d 533 (1989).

Wisconsin's long-arm statute provides for personal jurisdiction in any action over "a defendant who when the action is commenced: ... Is engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise." Wis.Stat. § 801.05(1)(d). Five factors affect whether a defendant's contacts with Wisconsin are "substantial and not isolated" for purposes of section 801.05(1)(d): (1) the quantity of contacts, (2) the nature and quality of the contacts, (3) the source of the contacts and their connection with the cause of action, (4) the interests of the State of Wisconsin, and (5) the convenience of the parties. *Nagel v. Crain Cutter Co.*, 50 Wis.2d 638, 648–50, 184 N.W.2d 876 (1971); *International Communications, Inc. v. Rates Tech., Inc.*, 694 F.Supp. 1347, 1350 (E.D.Wis.1988). A defendant gen-

---

1. Neither defendant contends that it was improperly served, only that this court has no personal jurisdiction. *See* Brunton's Memorandum in Support (April 15, 1997) at 6; Silva's Memorandum in Support (April 15, 1997) at 5–15.

2. JWA does not argue that rule 4(k)(2) applies. Silva Production may be subject to the jurisdiction of courts in Wyoming, where Brunton is located.

erally has "substantial and not isolated" contacts with the state if it "solicit[s], create[s], nurture[s], or maintain[s], whether through personal contacts or long-distance communications, a continuing business relationship with anyone in the state." *Stauffacher v. Bennett,* 969 F.2d 455, 457 (7th Cir.1992). Even if a nonresident never sets foot in Wisconsin, the existence of a continuing business relationship with someone in Wisconsin is enough to warrant an inference that the defendant benefits from services provided in Wisconsin "and could therefore be required, as a quid pro quo, to submit to the jurisdiction of the state's courts." *Id.* at 457–58.

Other subsections of the long-arm statute provide for personal jurisdiction in certain specific situations, such as in cases relating only to the commission of a tort or participation in a contract involving Wisconsin or its residents.

### 1. Silva Production

 JWA argues that Silva Production is subject to this court's jurisdiction based upon section 801.05(1)(d) as well as on the specific jurisdiction provisions of subsections 801.05(4) and 801.05(5). Because the requirements of section 801.05(1)(d) are satisfied, analysis of the other provisions is unnecessary.

It is true that Silva Production and the licensing agreement at the heart of this case initially had little, if any, relation to Wisconsin or its residents. That changed, however, in 1981 at the latest. On September 23, 1981, Silva Production entered into a contract with both Johnson Camping *and* Johnson Wax which amended the original licensing agreement. Page one of the 1981 agreement set forth that Johnson Wax's offices were located in Racine. Silva Production thus was a party to the transfer of the licensing agreement from Silva, Inc. in Indiana to JWA in Wisconsin and Johnson Camping in New York together. The licensing agreement as amended and extend-

ed was still in effect on the date this lawsuit was filed.

The evidence submitted by JWA, which must be assumed true at this stage, indicates substantial rather than isolated contact between Silva Production and JWA in Wisconsin. Even though Silva Production claims that Johnson Camping alone performed the American side of the licensing agreement, Silva Production acknowledges that its employees or representatives visited Wisconsin eight or ten times to discuss Silva Production's relationship with Johnson Camping. Silva Production's Memorandum in Support (April 15, 1997) at 5; Tillander Decl. at ¶ 15. During one of those visits Silva Production offered to purchase the SILVA trademark *from JWA,* not from Johnson Camping in New York. Johnson–Leipold Decl. at ¶ 12. Also, according to JWA, its compass orders and payment for Silva Production compasses originated in Wisconsin, and Silva Production sold JWA more than $7 million worth of compasses from 1993 to 1996 alone. *Id.* ¶¶ at 8, 16.[3]

While Silva Production admits it conducted correspondence and telephone calls with JWA at its Wisconsin address in regard to resolving this lawsuit, JWA's submissions show a longer and stronger correspondence relationship than that. JWA's evidence includes examples of routine correspondence regarding the licensing agreement addressed from Silva Production or its lawyers to Johnson Wax in Racine dating back to 1980 and 1981, and to JWA in Racine or Sturtevant from 1990 to 1996. In one letter faxed to JWA discussing a JWA employee's trip to Sweden, Silva Production's Tillander wrote that he "found i[t] very important to get it confirmed that our successful relationship can be further developed." *Id.,* Exh. C, Fax dated June 16, 1994. Another letter written by Tillander and addressed to JWA's John Crabb (apparently JWA's president) states that Tillander "would like to underline that we have had a successful collaboration for 23 years" and offers on Silva Production's behalf to "take over the current Silva stock from

---

**3.** Bill Wildprett, a Johnson Camping employee until July 1996 who now works for Brunton, states that all compass orders and payments were generated and sent to Silva Production by

Johnson Camping in New York. Brunton's Wildprett Decl. at ¶¶ 3, 10. At the current stage, however, this factual dispute must be resolved in JWA's favor.

JWA." *Id.*, Exh. C, Fax dated April 15, 1996. Other letters addressed from Silva Production to JWA discuss particular products. *See id.*, Exh. C. And finally, when it terminated the license agreement, Silva Production sent its notification letter to JWA *in Wisconsin. Id.*, Exh. D. These letters and JWA's evidence that it handled decisions regarding the supply relationship and its performance from Wisconsin, *id.* at ¶ 9, create the inference that JWA, not Johnson Camping in New York, had much to say and do regarding performance of the agreement and that Silva Production actively participated with JWA in Wisconsin in regard to the contract's implementation and termination.

Analysis of the five *Nagel* factors shows that exercise of personal jurisdiction by this court under section 801.05(1)(d) is proper. In its evidentiary submissions JWA provides almost 60 letters back and forth between JWA in Wisconsin and Silva Production. *See id.*, Exh. C. In addition to Silva Production's eight to ten trips to Wisconsin to visit JWA, a JWA employee visited Silva Production in Sweden at least once. *See id.*, Letter of June 13, 1994. Moreover, the vast majority of letters (almost 50) are dated 1994 or later, showing substantial correspondence between the parties in the two years preceding the filing of the complaint. This quantity of contacts is "substantial" and "not isolated".

The nature of the contacts included personal visits to Wisconsin that are high in "quality" and "connection" for personal jurisdiction purposes. These visits were made by Silva Production's president Hans–Gunner Tillander and other representatives to discuss the very supply agreement alleged in this case to have been breached and to offer to purchase the very trademark at issue in this case. The contacts are also of longstanding duration, going back approximately 16 years before the filing of this case.

In addition, Silva Production, in signing the 1981 agreement, assented that Wisconsin law would govern the contract between the parties. The invocation of Wisconsin law to govern an agreement is a strong connection with this forum. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (although a choice of law provision standing alone cannot confer personal jurisdiction, it nevertheless is a factor to be considered in determining whether a defendant has purposely invoked the benefits and protections of a state's laws for jurisdictional purposes).

Finally, although these last two factors are less important, Wisconsin has an interest in protecting its residents from trademark infringement and other prohibited business practices, and the convenience of the parties does not weigh against this forum. Sweden would be an inconvenient forum for plaintiffs and for defendant Brunton. Silva Production, which now owns an American subsidiary, cannot be heard to complain that dealing with matters in America is too difficult.

Although each case must be determined on its own facts, this court's exercise of jurisdiction pursuant to section 801.05(1)(d) is supported by a comparison to prior cases. In *Miller Brewing Co. v. Acme Process Equipment Co.*, 441 F.Supp. 520 (E.D.Wis.1977) (Gordon, J.), a Pennsylvania corporation was found to have conducted substantial and not isolated business activities in Wisconsin based upon its extensive interstate dealings with Miller in Wisconsin, occasional meetings in Milwaukee between its representatives and those from Miller, and, although of lesser importance, the foreign corporation's listings in certain publications distributed interstate and that made their way to Wisconsin. Personal jurisdiction was proper even though the three contracts at issue involved the defendant's manufacture and installation of brewery equipment in New York and Texas. In the present case, regardless of whether, as in *Miller*, performance of the licensing agreement may have taken place in New York, similar to *Miller*, extensive interstate dealings occurred between Silva Production in Sweden and JWA in Wisconsin, and defendant's employees occasionally traveled to Wisconsin in connection with the parties' relationship.

In *Jadair, Inc. v. Van Lott, Inc.*, 512 F.Supp. 1141 (E.D.Wis.1981) (Reynolds, J.), the court found section 801.05(1)(d) satisfied when a defendant made about sixty purchases of equipment and parts totaling about $1.2 million in value from Wisconsin sellers

pursuant to distributorship agreements, the machines were all shipped from Wisconsin to the defendant in South Carolina, employees of the defendant attended training seminars in Wisconsin, and correspondence between the defendant and the Wisconsin manufacturers was extensive. Like *Jadair,* in this case the licensing agreement generated sales in the millions of dollars, Silva Production employees visited Wisconsin, and correspondence between the parties was extensive.

While Silva Production may not have solicited or created the relationship with JWA, which arose out of JWA's purchase of Silva, Inc., Silva Production nevertheless nurtured and maintained a continuing business relationship with JWA through the 1981 agreement, personal meetings in Wisconsin, and long-distance communications. *See Stauffacher,* 969 F.2d at 457. As a result, there is enough contact with the state to warrant an inference that the defendant benefits from services provided in Wisconsin and therefore is required as a quid pro quo, to submit to the jurisdiction of this state's courts. *See id.* at 457–58.

### 2. Brunton

 Brunton claims that it is not doing business in Wisconsin as defined in section 801.05(d)(1) because it has no office or manufacturing facility here, does not target advertising specifically at this state, and its independent sales representatives do not reside in Wisconsin. But although Brunton claims that its contacts with Wisconsinites were isolated rather than substantial or continuous, the factual evidence provided by JWA indicates otherwise.

Even though Brunton's sales representative works out of Illinois, he travels to and solicits business from Wisconsin regularly. Representative Danny Gainor indicated at deposition that in identifying customers for Brunton products he looks at the existing customer base in his geographic territory, which includes Wisconsin. JWA's Arent Decl., Exh. I at 16. As of November 1996, Gainor had three customers in Wisconsin purchasing Brunton products: Wild Birds Unlimited, Point Sporting Goods, and Mills Fleet Supply. *Id.* at 6. At the time this case

was filed Gainor traveled to Wisconsin at least eight to ten workdays a month. *Id.* at 5–6. Even though he also sold other companies' products during many of his visits, Gainor remembered the following numbers of in-person sales calls between September 1995 and November 1996 to sell Brunton products: twice to Wild Birds in Madison, about six times to Point Sporting Goods in Stevens Point, and once to Mills Fleet Supply in Appleton. *Id.* at 10–13. Over the 14–month period, Gainor spoke with his Wild Birds contact in Madison approximately six to ten times regarding Brunton products, and he spoke with Point Sporting Goods monthly, although Brunton products were discussed only about 20 percent of the time. *Id.* at 10–11, 13. Gainor also visited Galensky Sports Center in Racine to solicit business for Brunton products, although the visit did not result in any sales. *Id.* at 19–20.

 Visits by a party's agents are considered visits by the party itself. *See Wisconsin Elec. Mfg. Co. v. Pennant Products, Inc.,* 619 F.2d 676, 677 (7th Cir.1980). Also, within the five years prior to the filing of this lawsuit, Brunton employees on at least two and perhaps as many as five separate occasions accompanied sales representatives in visiting various Wisconsin customers. Arent Decl., Exh. A at 25–27, 53–58, Exh. B, Exh. G at 65, Exh. K.

When a sales representative generates a customer's purchase of Brunton products, the representative transmits the order to Brunton via mail or fax. Brunton fills the order and ships the merchandise directly to the customer. Brunton invoices the customer directly and the customer sends payment directly to Brunton. Arent Decl., Exh. A at 27–28. From 1991 through September 1996 Brunton invoiced Wisconsin customers for just under $675,000 in products. *See* Arent Decl., Exh. F. Taking all inferences in JWA's favor, that means Brunton shipped that much product into Wisconsin. Brunton's sales within Wisconsin were not one-shot isolated events with a variety of customers, either. JWA's summary of Brunton's sales shows numerous filled orders throughout the five-year period to Wild Birds Unlimited, Point Sporting Goods, Mills Fleet Supply, and Gan-

der Mountain, which is located in Wilmot, Wisconsin. *See id.*

On November 6, 1996, a paralegal working for JWA's counsel found Brunton compasses available for sale at three stores in the greater Milwaukee area. JWA's Walther Decl. at ¶¶ 1–5.

In addition to all of this sales activity, on the purchasing side of its business, Brunton ordered almost $95,000 in supplies and products from companies located in Wisconsin between 1991 and June 1996. *See id.* Again, these were not isolated contacts with various suppliers, but instead include a five-year continuous relationship with a company named Conney Safety Products.

The quantity of contacts, especially regarding sales of products to Wisconsin customers, is high enough to warrant the exercise of jurisdiction. While Brunton characterizes its representative's visits as "occasional", the prima facie evidence shows instead that the visits and telephone contacts initiated by the representatives were regular and continuous. Brunton also ignores its own numerous contacts—over a thousand—in shipping products to and invoicing Wisconsin customers directly. That Brunton advertisements make their way into this state adds to the quantity of contacts.

The nature of the contacts relates to the sale of compasses—the heart of this very case. While this case did not actually arise from the representative's visits to Wisconsin and Brunton's shipping of products prior to the filing date of this lawsuit, the sources of most of the contacts are the very representatives and Brunton employees whom JWA today alleges infringe its trademarks and trade dress by promotion and sale of the NEXUS line.

The quality of many contacts was high—personal visits and telephone calls from Brunton employees and representatives to active customers to generate further business and the shipping of and billing for merchandise pursuant to those personal contacts.

The State of Wisconsin certainly has an interest in protecting its residents from infringements upon their commercial rights. And finally, although Wyoming may be more convenient for Brunton and possibly Silva Production, Wisconsin is more convenient for JWA.

As with Silva Production above, case law supports the exercise of jurisdiction over Brunton. In *Harley–Davidson Motor Co. v. Strada*, 78 F.R.D. 521 (E.D.Wis.1978) (Warren, J.), the court found section 801.05(1)(d) satisfied when a defendant was involved in 49 sales transactions with eight retailers in Wisconsin, sales totaled over $1,100 in each of four years, and the defendant had delivered catalogs of its products to some Wisconsin retailers. The facts in this case involving Brunton are even stronger than in *Harley–Davidson*. Over a five-year period Brunton made hundreds of sales to four retailers totaling about $675,000. It made numerous purchases from suppliers totaling almost $100,000. Instead of sending catalogs to prospective customers like Galensky, Brunton's sales representative made personal visits. In addition, Brunton acknowledges that national advertisements may have reached Wisconsites.

Based upon all of these facts and reasons, JWA has presented prima facie evidence that Brunton solicited, created, nurtured, and maintained, through personal contacts and long-distance communications, a years-long continuing business relationship with at least four customers and one supplier within this state. Brunton was doing substantial and not isolated business within Wisconsin as described in section 801.05(1)(d). Consideration of other portions of the long-arm statute is unnecessary.

### B. Constitutional Considerations

 Wisconsin courts presume compliance with the Wisconsin long-arm statute satisfies the requirements of due process as well. The presumption may be rebutted by a defendant using the five *Nagel* factors discussed above, *Lincoln v. Seawright*, 104 Wis.2d 4, 10–11, 310 N.W.2d 596 (1981); *International Communications*, 694 F.Supp. at 1350, or by looking to federal law.

 Due process permits a Wisconsin court to exercise jurisdiction over a defendant who has "minimum contacts" with this

state such that maintenance of a lawsuit here "does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The amount and kind of activities that make it reasonable and just to subject a defendant to jurisdiction depend upon the facts of each case. *Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

What the *International Shoe* "minimum contacts" standard means in a particular case depends on whether the plaintiff wishes the court to assert "general" or "specific" jurisdiction. *RAR,* 107 F.3d at 1277. "Specific jurisdiction refers to jurisdiction over a defendant in a suit 'arising out of or related to the defendant's contacts with the forum.'" *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). When a controversy is related to or arises out of a defendant's contacts with the forum, a relationship among the defendant, the forum, and the litigation is the essential foundation of personal jurisdiction. *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868. General jurisdiction, meanwhile is for suits neither arising out of nor related to the defendant's contacts, and is permitted only where the defendant has "continuous and systematic general business contacts" with the forum. *Id.* at 414 n. 9, 416, 104 S.Ct. 1868.

Either way, the touchstone remains whether the defendant purposefully established "minimum contacts" in the forum state such that jurisdiction is fair and just for that case. *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174; *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154. A defendant's conduct and connection with Wisconsin must be such that it "should reasonably anticipate being haled into court [here]." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Generally, "[w]hen a corporation 'purposely avails itself of the privilege of conducting activities within the forum State,' ... it has clear notice that it is subject to suit there." *World–Wide*

*Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). Where a nonresident "has created 'continuing obligations' between himself and residents of the forum, ... he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174.

### 1. Silva Production

The facts discussed above in regard to the long-arm statute and the five *Nagel* factors show that jurisdiction over Silva Production comports with due process. Compliance with section 801.05(1)(d) shows that Silva Production's actions were continuous and systematic. Moreover, because all of Silva Production's contacts involve its relationship and licensing agreement with JWA, constitutional specific jurisdiction requirements are easily met.

Silva Production has more than enough "minimum contacts" in and with Wisconsin to satisfy due process concerns; its own actions in its relationship with JWA created a 'substantial connection' with this forum. *See Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. Where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. *Id.* at 477, 105 S.Ct. 2174. Other considerations may be, among other things, the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 476–77, 105 S.Ct. 2174.

Other than pointing to the general hardship on foreign nationals mentioned by

the Supreme Court in *Asahi Metal Ind. Co. v. Superior Court*, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987),[4] Silva Production proffers no other compelling reasons why jurisdiction over it would be unfair or unreasonable. Although Wisconsin is quite a long way from Sweden, Wyoming is even further, and Silva Production manages to own and direct a subsidiary there. Silva Production has not suggested any social policy of Sweden or any other potentially involved forum that competes with Wisconsin law. Nothing compels a finding that jurisdiction in this forum would be fundamentally unfair.

Silva Production argues that this court's analysis must begin and end with the analysis set forth in *International Shoe, World-Wide Volkswagen,* and *Burger King.* Silva Production's Reply (May 19, 1997) at 6. *Burger King,* especially, indicates that the exercise of personal jurisdiction by this court over Silva is reasonable. In *Burger King,* the Supreme Court found proper and fair a Florida court's exercise of jurisdiction over two Burger King franchisees located in Michigan. Even though the franchisees argued that they dealt mostly with Burger King's Michigan office, their contract recognized that Burger King's operations were conducted from Miami, directed all relevant notices and payments to be sent to Miami, and indicated that the agreement was subject to Florida law. Moreover, the parties' actual course of dealing confirmed that decision-making authority was vested in Miami, and a continuous course of direct communications by mail and telephone occurred between the franchisees and the Miami headquarters. *Burger King,* 471 U.S. at 480–81, 105 S.Ct. 2174.

Like the franchisees in *Burger King,* even though Silva Production claims it dealt mostly with Johnson Camping in New York the evidence shows that the 1981 agreement recognized JWA's integral role in the supply relationship. When it came to discussing continuation of the licensing agreement, possible purchase by Silva Production of the SILVA trademark, and termination of the licensing agreement, Silva Production knew that those decisions were made by JWA in Wisconsin rather than Johnson Camping in New York. Here, like the franchisees in *Burger King,* Silva Production created continuing obligations between itself and a resident of this forum, and thus "manifestly has availed [it]self of the privilege of conducting business [here]." *See id.* at 476, 105 S.Ct. 2174. It is therefore not presumptively unreasonable to require Silva Production to submit to the burdens of litigation in this forum as well. *See id.*

Other cases support a finding that exercising jurisdiction in this case does not offend due process. *See Miller, supra* (finding jurisdiction over foreign corporation involved in three contracts with Miller in Wisconsin comported with due process requirements). *Jadair, supra* (finding due process requirements met).

Silva's motion to dismiss therefore will be denied.

### 2. Brunton

■ Personal jurisdiction by this court over Brunton also comports with due process requirements. The above-described sales activity through the in-person visits and telephone calls of Brunton's sales representatives, the direct-shipping of products from Brunton to Wisconsin customers, the direct billing of Wisconsin customers by Brunton, purchases of supplies from Conney, and the placement of advertisements known to reach Wisconsinites constituted continuous and systematic general business contacts over the five-year period prior to commencement of this lawsuit. The periodic visits by Brunton's own employees add even more support to the exercise of jurisdiction. *See Burger King,* 471 U.S. at 476, 105 S.Ct. 2174 (physical visits to the forum state enhance a poten-

---

4. In *Asahi,* the Supreme Court stated that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi,* 480 U.S. at 114, 107 S.Ct. 1026. At the same time, however, the Court recognized that when minimum contacts have been established, "often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id.*

tial defendant's affiliation with a state and reinforce the reasonable foreseeability of suit there).

Brunton had more than enough contact with this state such that maintenance of a lawsuit here based upon general jurisdiction principles "does not offend traditional notions of fair play and substantial justice." *See International Shoe*, 326 U.S. at 316, 66 S.Ct. 154. Brunton could reasonably anticipate being haled into court here. *See World– Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559. Brunton's contacts with Wisconsinites in Wisconsin were not random, fortuitous, or attenuated, *see Burger King*, 471 US. at 486, 105 S.Ct. 2174, or "independent transactions where an entity or an individual contacts Brunton and purchases consumer products," as Brunton characterizes them, Brunton's Reply Memorandum (May 19, 1997) at 10. They instead were regular, systematic, and continuous actions by Brunton itself as well as its representatives—as part of continuing business relationships—that created a substantial connection with this forum. *See Burger King*, 471 U.S. at 475, 105 S.Ct. 2174; *see also Helicopteros*, 466 U.S. at 416, 104 S.Ct. 1868.

In *Helicopteros*, the Supreme Court found personal jurisdiction not to exist over a Columbian corporation whose contacts with Texas consisted of sending an officer to Houston for one negotiation session, accepting checks drawn on a Texas bank, and purchasing helicopters from and sending employees for training to a company in Fort Worth. The contacts in this case are greater in both number and quality than those in *Helicopteros*. Brunton made regular and continuous sales to and solicitations of Wisconsin residents.

Although, according to Brunton, it is a small company in Wyoming and the requirement of litigating here will severely disrupt its operation, the inconvenience by having this lawsuit proceed in Wisconsin is just not a compelling enough burden to declare personal jurisdiction here unfair or unjust, especially when Brunton has taken in at least $675,-000 from Wisconsin residents and admits that these sales constituted only a small percentage of its business. Brunton's Supplemental Herron Decl. (Jan. 24, 1997) at ¶ 4.

## III. MOTION TO TRANSFER

■ As an alternative to dismissal, Brunton asks that this case be transferred to Wyoming pursuant to 28 U.S.C. § 1406(a) because of improper venue (not pursuant to 28 U.S.C. § 1404(a) for the convenience of parties and witnesses). Under 28 U.S.C. § 1391(b)(1) venue is proper in "a judicial district where any defendant resides, if all defendants reside in the same State." A corporate defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the lawsuit commenced. 28 U.S.C. § 1391(c). Because Brunton and Silva Production both "reside" in this district under section 1391(c), venue here is proper,[5] so the motion must be denied.

## IV. CONCLUSION

The requirements for personal jurisdiction under the long-arm statute and the Constitution are met in regard to both defendants.

**THEREFORE, IT IS ORDERED** that Silva Production's motion to dismiss and Brunton's motions to dismiss or transfer are **DENIED.**

---

5. Brunton does not argue that this case should be in the Western District of Wisconsin rather than here. *See* 28 U.S.C. § 1391(c) (in a state having more than one judicial district a corporation is deemed to reside in the district within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate state). In any event, the locations of most of Brunton's customers or potential customers—Appleton, Racine, and Wilmot—are within the Eastern District, Brunton employees themselves traveled to such places as Waukesha, Brookfield, and Oshkosh when traveling with sales reps, *see* Arent Decl., Exh. B, and Brunton products have been found in the greater Milwaukee area.